EMPIRE STATE SURETY CO. v. CARROLL COUNTY et al.

(Circuit Court of Appeals, Eighth Circuit.  February 28, 1912.)

Nos. 3,357–3,364.

*(Syllabus by the Court.)*

1. PRINCIPAL AND SURETY (§ 20*)—CREATION OF RELEASE—WRITTEN INSTRUMENT—CONDITIONAL DELIVERY.

Where the principal named in a bond would be liable in the absence of the bond for the acts or omissions which constitute the breach in suit, the failure of the principal to execute the bond does not relieve the surety, who has executed it and caused or permitted it to be delivered to the obligee, from the liability for the breach.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 39–42; Dec. Dig. § 20.*]

2. COUNTIES (§ 96*)—OFFICERS—LIABILITIES ON BONDS.

The term of the bond of an officer to a county fixed by statute and clearly expressed in the bond may not be shortened or changed by the fact that the county supervisors had called for or prescribed a bond with a shorter term before the bond in suit was made and accepted.

[Ed. Note.—For other cases, see Counties, Cent. Dig. §§ 137–139; Dec. Dig. § 96.*]

3. OFFICERS (§ 127*)—LIABILITIES ON BONDS.

Sureties on an official bond liable by its terms concurrently with sureties on other bonds of the same officer, who permit their bond to stand unquestioned for more than two years after it was made and until the officer has defaulted, present no equity as against the sureties on concurrent bonds, for its reformation so as to relieve them from their share of the liability and cast it upon the sureties on the other bond, by proof that they failed to read their bond, but all parties to it stated previous to its execution and understood that it was to be so limited in its terms as to exclude the liability in controversy.

[Ed. Note.—For other cases, see Officers, Cent. Dig. § 223; Dec. Dig § 127.*]

4. TRUSTS (§ 353*)—FOLLOWING TRUST FUNDS—PREFERENCES.

A cestui que trust who is the equitable owner of his fund for one sound reason is as much entitled to it as another who is the equitable owner of of his fund for many sound reasons, and the latter is entitled to no preference over the former in payment out of a common fund in which the trustee has commingled them.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 526; Dec. Dig § 353.*]

5. TRUSTS (§ 358*)—FOLLOWING TRUST FUNDS—PREFERENCES.

It is indispensable to the maintenance by a cestui que trust of a claim to preferential payment out of the proceeds of the estate of an insolvent that clear proof be made that the trust property or its proceeds went into a specific fund or into a specific identified piece of property which came to the hands of the receiver, and then the claim can be sustained to that fund or property only, and only to the extent that the trust property or its proceeds went into it.

It is not sufficient to prove that the trust property or its proceeds went into the general assets of the insolvent estate and increased the amount and value thereof which came to the hands of the receiver.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 523, 553; Dec. Dig. § 358.*]

**6. TRUSTS (§ 358*)—FOLLOWING TRUST FUNDS—PREFERENCES.**

Proof that a trustee mingled trust funds with his own and made payments out of the common fund is a sufficient identification of the remainder, not exceeding the smallest amount the fund contained subsequent to the commingling, coming to the hands of the receiver as trust property, because the legal presumption is that he regarded the law and neither paid out nor invested in other security or property the trust fund, but kept it sacred.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 523, 553; Dec. Dig. § 358.*

Following trust property converted by trustee as dependent on its identification, see note to In re T. A. McIntyre & Co., 108 C. C. A. 545.]

**7. TRUSTS (§ 372*)—FOLLOWING TRUST FUNDS—PREFERENCES.**

For the same reason the legal presumption is that promissory notes, bonds, and other property coming to the hands of the receiver were not produced by the use of and are not trust property.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 600–603; Dec. Dig. § 372.*]

**8. TRUSTS (§ 353*)—FOLLOWING TRUST FUNDS—PREFERENCES.**

Where a trustee has mingled in a common fund the moneys of many cestuis que trustent and then made payments out of it, the legal presumption is that the moneys were paid out in the order in which they were paid in, and the cestuis que trustent are equitably entitled to any allowable preferences in the inverse order of the times of their respective payments into the fund.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 526; Dec. Dig. § 353.*]

**9. BANKS AND BANKING (§ 80*)—INSOLVENCY—CLAIMS AGAINST INSOLVENT BANK—PREFERENCES.**

Checks of third parties on a bank with which they are deposited which are paid by crediting the bank and charging the drawers on its books, do not increase the cash in the bank and present no basis for a preferential payment to the depositor.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 184–196; Dec. Dig. § 80.*]

**10. BANKS AND BANKING (§ 80*)—INSOLVENCY—CLAIMS AGAINST INSOLVENT BANK—PREFERENCES.**

The deposit of checks of third parties, which are credited to the depositor and used by the bank to pay its debts, bring no money into its cash and lay no foundation for a preferential payment to the depositor.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 184–196; Dec. Dig. § 80.*]

**11. BANKS AND BANKING (§ 80*)—INSOLVENCY—CLAIMS AGAINST INSOLVENT BANK—PREFERENCES.**

Checks of third parties deposited with a bank credited to the depositor and collected through a clearing house do not warrant a preferential payment, in the absence of proof of the actual balance of cash which the bank received through the clearing house, for they may have been, and presumptively were, used in whole or in part to discharge debts of the bank.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 184–196; Dec. Dig. § 80.*

Right to proceeds of collection in insolvency of collecting bank, see note to Western German Bank v. Norvell, 69 C. C. A. 333.]

**12. RECEIVERS (§ 152*)—CLAIMS AGAINST ESTATE—PREFERENCES.**

A claim of a cestui que trust to a preference in payment out of the assets of an insolvent estate will not be allowed over the objection of

the receiver, where the claims of the majority of the creditors in amount and in value which the receiver represents are equal to it in law and in equity, although such creditors are content to share ratably with all the creditors and make no claims for preferences.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 272–275, 278; Dec. Dig. § 152.*]

13. BANKS AND BANKING (§ 287*)—NATIONAL BANKS—RECEIVERS—POWERS.

It is beyond the power of a receiver of a national bank, who is a party to a decree allowing a preferred claim in a suit between a creditor of the insolvent who is entitled to appeal from the decree and the receiver and the successful claimant, to deprive the creditor of his right to appeal from the decree and this court of its jurisdiction to review it, by compromising it with the successful claimant without the consent of the aggrieved creditor and without any order of the court. Barber Asphalt Paving Co. v. Morris, 132 Fed. 945, 953, 66 C. C. A. 55, 63, 67 L. R. A. 761.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1089–1127; Dec. Dig. § 287.*]

Hook, Circuit Judge, dissenting in part.

Appeals from the Circuit Court of the United States for the Southern District of Iowa.

Suits in equity by the Chicago & Northwestern Railway Company against the First National Bank of Carroll, Iowa, and another, and by the Empire State Surety Company and another against Carroll County and others, consolidated. From the decrees, certain parties appeal. Reversed and remanded, with instructions.

These are appeals from decrees of the Circuit Court which adjudged the claims of the Chicago & Northwestern Railway Company, of Carroll County, Iowa, of George L. McAllister, its treasurer, and of the sureties on his bonds against each other, and for preferences in the payment of claims against the First National Bank of Iowa by the receiver of its property. The bank failed on October 17, 1908, owing the Railway Company about $2,000 and the county about $25,000. Its indebtedness to the county arose from the deposit with it between June 15, 1908, and October 18, 1908, of county funds by the county treasurer without any order or direction of the county board to make such deposits so that the county treasurer and the sureties on his bonds were liable for any loss the county might sustain by the failure of the bank to pay the debt it incurred on account of these deposits. The term of office of the county treasurer commenced on January 1, 1907, and continued two years. The county board fixed the amount of his bonds at $60,000. In January, 1907, he gave a bond for $25,000 with the Empire State Surety Company as surety and a second bond for $25,000 with the Illinois Surety Company as surety, and in April, 1907, he gave a third bond for $10,000 with John Meyers, William Arts, and Theresia McAllister as sureties. For more than four months before the bank suspended payments it had been, and its officers had known that it was, insolvent. But its credit among those who were not aware of its condition had enabled it during this time to borrow of one to pay another and to continue its business. When it finally failed on October 17, 1908, it still had on hand $5,912.05 and the Surety Companies and the Railway Company respectively claimed that this was money paid into the bank by them after the bank officers knew that it was insolvent and that it could not repay the money thus paid into the bank by them, and that this money, therefore, became a trust fund which they were entitled to have applied to the payment of their claims in preference to the payment of the claims of other creditors.

In this state of the case, the Chicago & Northwestern Railway Company, on January 18, 1909, exhibited its bill in equity in the court below against the bank and Fowler, the receiver of its property, to secure a preference over other creditors in the payment of its claim against the bank. Thereupon, in

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

April, 1909, the Empire State Surety Company and the Illinois Surety Company brought their bill in the same court against Carroll county, the First National Bank of Carroll, I. W. Fowler, the receiver of the property of this bank, George L. McAllister, the county treasurer, and John Meyers, William Arts, and Theresia McAllister, the sureties on his bond for $10,000, and prayed for an adjudication of the amount due to the county of Carroll from the bank, that the individual sureties be adjudged to be liable with the surety companies to pay their just share of the amount of the treasurer's debt to the county, and that the receiver of the bank be adjudged to pay this amount out of the proceeds of its property in preference to the payment of claims of other creditors. The Illinois Company subsequently discovered that Mc-Allister, the principal named in the bond, never signed it, and thereupon it withdrew as complainant, became a defendant, and answered the bill of the Empire Company and denied all liability on its bond. Before the final hearing of these two suits the Railway Company was made a party in the suit of the Empire Company, all the parties to the latter suit were made parties to the suit of the Railway Company, and the two suits were by consent and by order of the court consolidated for final hearing. They were afterwards heard and decided by the Circuit Court, and decrees were rendered on the same day to the effect, among other things: (1) That the Illinois Company was liable on its bond for its just share of the debt of the treasurer to the county; (2) that the individual sureties were not liable for any part of that debt; (3) that the Chicago & Northwestern Railway Company was entitled to the payment in preference to other creditors of a balance of $1,895.80 out of the property of the bank; and (4) that the two surety companies were entitled to payment out of the property of the bank in preference to other creditors of $3,132.21. These conclusions are now assailed on every side by proper appeals in the cases in hand which demand their review by this court.

John F. Stout (Halleck F. Rose, on the brief), for Empire State Surety Co.

James C. Davis (A. A. McLaughlin, on the brief), for Chicago & N. W. Ry. Co.

Emmet Tinley (W. E. Mitchell, on the brief), for Illinois Surety Co.

George S. Wright, for appellees Meyers, McAllister, and Arts.

F. F. Oldham (W. R. Lee and E. A. Robb, on the brief), for First Nat. Bank of Carroll, Iowa, and I. W. Fowler, receiver.

E. A. Wissler (W. R. Lee and E. A. Robb, on the brief), for appellant Carroll County, Iowa.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

SANBORN, Circuit Judge (after stating the facts as above). [1] 1. Did the failure of the principal, the county treasurer, to sign the bond of his surety, the Illinois Company, relieve that company from liability thereon? The statutes of Iowa 1897, §§ 1177, 1183, required the county treasurer to give a bond conditioned, among other things, to "promptly account for all balances of money remaining in his hands at the termination of his office" and to "promptly pay over to the officer or person entitled thereto, the moneys which may come into his hands by virtue of his office," and it is for a breach of these conditions of the bond and of these only that the Illinois Company is charged with liability in these cases. The statutes also provided that the sureties on such a bond should "be liable for all money or public property that may come into the hands of such officer at any time during his possession of the office" (section 1183); that the county treasurer should take and subscribe a prescribed oath of office on the bond,

or on a paper attached thereto (section 1181); that the penal sum for which he should give bond should be fixed by the board of supervisors of the county (section 1185); and that his bond should be approved, or disapproved, by that board within five days after its presentation for that purpose and should be indorsed, in case of approval, to that effect and filed (section 1188). In this state of the law the treasurer applied to the agent of the Illinois Company in Iowa to furnish him as his surety his official bond in the penal sum of $25,000 and the agent sent his application and a blank form of the bond to the company at its general office in Illinois. The company there filled the blanks for the names of the obligors with the name of the treasurer as principal and with its own name as surety, and the blank for the amount of the bond with $25,000, executed it, and sent it back to its agent in Iowa, who caused it to be delivered to the treasurer with a direction to him that he should execute it as principal before he delivered it. The treasurer then subscribed and executed his official oath, which was written on the bond, and without signing it as principal delivered it to the county as his official bond, and it was accepted as such and filed with the county auditor.

The Illinois Company and its officers expected and intended that the treasurer should sign the bond as principal and that it should not be delivered to the county until it was so signed by them, exacted no promise of and made no agreement with the treasurer to that effect, and they gave no notice to the county of their expectation or intention in this regard other than the notice, if any, inferable from the absence of the treasurer's signature on the bond. The county, the treasurer, and the Surety Company all believed, and the county permitted the treasurer to receive and hold its funds during the term of the bond in reliance upon its belief, that the Surety Company was legally bound thereby. There is no evidence that the Surety Company ever made any investigation to find out whether or not the treasurer had signed the bond before this litigation arose. It collected its premium in 1907 for its services as surety on this bond during that year and again in 1908 for its services as surety on this bond during the second year. No one discovered the alleged defect in the bond now asserted until many months after the defalcation of the treasurer, and, when the Illinois Company discovered it, it tendered repayment of the premiums and insisted that it never was liable upon the bond.

It was undoubtedly lawful for the county to take and for the Surety Company to give a bond made and executed by itself only, conditioned as prescribed by section 1183 of the statutes of Iowa, to indemnify the county against the defalcations of the treasurer. If the Surety Company had intentionally made and delivered, and the county had intentionally accepted and relied upon, such a bond, it is clear that the Surety Company could not have escaped liability thereon, for there is no prohibition in the statutes of such a contract, and it would have constituted a valid agreement under the common law. Nor can there be any doubt that the Surety Company would not have been bound by the bond it executed if it had distinctly notified the county so that the latter knew before it received the bond that the

Surety Company did not intend to be and declared that it would not be bound by the bond unless it was executed by the treasurer as principal before it was delivered to the county.

Now, the facts are that the Surety Company did not intend to be bound unless the treasurer signed the bond before it was delivered, and the county supposed that the Surety Company was and intended that it should be bound by the bond it had executed and had caused to be delivered to it. If the treasurer had done his duty, if he had either signed the bond as principal or had notified the county that the Surety Company did not intend to be bound by it, or that it did not intend that it should be delivered until he signed it, the alleged defect would not have existed, and this controversy would not have arisen. The real question in the case therefore is: Shall the Surety Company or the county suffer for the failure of the treasurer to discharge his duty? It is a general and salutary maxim of equity jurisprudence that, where one of two innocent parties must suffer from the fault of a third, he whose negligence or trust put it in the power of the third party to cause the loss ought to sustain it. The Surety Company executed this bond and delivered it to its associate and employer, the treasurer. It had it in its power to clearly express in writing in the bond itself that it would not be bound thereby until the treasurer signed it. It had it in its power to require the treasurer to sign it before it executed it. It had it in its power to retain the possession and thereby to prevent a delivery of the bond until the treasurer signed it. It did none of these things. It delivered the bond duly executed by itself to its employer, the treasurer, and thereby furnished him with the means of inducing the county in reliance upon it to permit him to receive its funds and cause this loss. If now the Surety Company may repudiate the acts of its employer which became effective by reason of its executed bond which it intrusted to him for a premium which he paid, the county or the sureties on concurrent bonds must lose thousands of dollars which throughout the terms of the bonds all parties in reliance upon the bond of the Illinois Company believed and intended should be saved to them by that bond. If, on the other hand, the liability of the Illinois Company upon this bond is affirmed, it will suffer no loss in these cases which it would not have sustained, and it will have the same recourse over upon the treasurer which it would have had if the treasurer had signed the bond. In other words, an affirmance of the liability of the Illinois Company places loss and liability here where the acts of the Surety Company in executing and delivering its bond to its employer induced the county to believe, and where all parties supposed during the term of the bond they were and would be, and where they all intended they should be, while a denial of that liability imposes them upon others and releases the Illinois Company whose acts induced the county to risk them. In this state of the case, the more persuasive reasons argue for the conclusion, and the maxims and principles of equity demand, that the Illinois Company shall be required to comply with the terms of its bond although the principal never signed it. This conclusion has not been reached without a consideration of the arguments: First, that this is a joint

and not a joint and several bond and that some authorities make a distinction betwen them in the consideration and decision of this question. But this distinction is immaterial where, as in these cases, the relation of principal and surety necessarily exists under the law whether the bond is signed by the principal or not. Second, that the bond, if signed by the treasurer, would have extended his liability beyond that incurred by him in the absence of his signature; but it would not have extended his liability for the breach of duty or of the bond which is the occasion of these suits, and hence that fact is immaterial in these cases, and it will be soon enough to consider its effect when the liability of some surety for matters involved in such extensions is at issue. And, third, that the facts that in the body of the bond the treasurer was named as principal and the Surety Company as surety, and that the bond was not signed by the principal when accepted by the county, constituted notice to the latter that the bond was incomplete and that the Surety Company never intended that it should be delivered or that the company should be bound by it until the treasurer signed it. But the treasurer and the Surety Company on one side were negotiating at arm's length with the county on the other side to make a contract not to provide the county with the personal liability of the treasurer for his defalcation now in issue, for it had that liability without the bond, but to furnish the county with the security of a surety that that liability of the treasurer would be discharged. It was the province and duty of the treasurer and of the Surety Company to determine what security they would offer, and that of the county to decide whether or not it would accept the security they offered. It was the duty of the Surety Company and of its employer and associate in this negotiation, the treasurer, to see that the bond they tendered was so signed and executed that it charged them with the legal liability they respectively intended to assume. The county stood in no fiduciary relation to the Surety Company, and it owed that company no duty to see that the bond was signed or executed as the latter intended. It was its right to presume and to rely on the presumption that the bond duly executed by the Surety Company and tendered to it by its employer, the treasurer, was signed and executed as the Surety Company intended it should be, notwithstanding the fact that the Surety Company had not required the treasurer to sign it before it put it in his hands. By placing it in his possession, it gave him the power to deliver it, because the duty to see that it was signed and executed as the Surety Company intended was on that company and not on the county. And now that the county has lawfully relied upon this presumption until the treasurer has defaulted and the liability of the Surety Company has accrued, that company ought to be and it is estopped in equity from denying its obligation to do what it agreed to do by the expressed terms of the bond it executed and caused to be delivered to the county.

This question is not a novel one in this court, and the court is not ignorant of the fact that there are many decisions which are more or less in conflict with the views which have been expressed. Johnson v. Kimball Township, 39 Mich. 187, 33 Am. Rep. 372; Board of

Education v. Sweeney, 1 S. D. 642, 48 N. W. 302, 36 Am. St. Rep. 767; Russell v. Annable, 109 Mass. 72, 12 Am. Rep. 665; Gay v. Murphy, 134 Mo. 98, 34 S. W. 1091, 56 Am. St. Rep. 496; Martin v. Hornsby, 55 Minn. 187, 56 N. W. 751, 43 Am. St. Rep. 487; Bjoin v. Anglim, 97 Minn. 526, 107 N. W. 558; Weir v. Mead, 101 Cal. 125, 35 Pac. 567, 40 Am. St. Rep. 46; Bean v. Parker, 17 Mass. 591; Wood v. Washburn, 2 Pick. (Mass.) 24; Goodyear Dental Vulcanite Co. v. Bacon, 151 Mass. 460, 24 N. E. 404, 8 L. R. A. 486; Wild Cat Branch v. Ball, 45 Ind. 213; Novak v. Pitlick, 120 Iowa, 286, 94 N. W. 916, 98 Am. St. Rep. 360. In deference to the exhaustive and forceful presentation of this case by counsel for the Illinois Company, these authorities have been again examined, and the reasons suggested for the conclusions reached therein have been considered; but a review of the arguments and reasons which have induced courts to reach opposite conclusions in the decision of the question here in issue has served but to strengthen our conviction that the more cogent reasons persuade, and the principles of equity demand, that we adhere to the conclusion that, where the principal named in the bond would be liable in the absence of the bond for the acts or omissions which constitute the breach of its condition in suit, the failure of the principal to sign the bond does not relieve the surety who has executed and caused, or permitted, it to be delivered to the obligee, from its liability for the breach of its condition. United States Fidelity & Guaranty Co. v. Haggart, 91 C. C. A. 289, 297, 163 Fed. 801, 809; St. Louis Brewing Ass'n v. Hayes, 38 C. C. A. 449, 97 Fed. 859; State v. Bowman, 10 Ohio, 445; City of Deering v. Moore, 86 Me. 181, 29 Atl. 988, 41 Am. St. Rep. 534; Pima County v. Snyder, 5 Ariz. 45, 44 Pac. 297; Douglas County v. Bardon, 79 Wis. 641, 48 N. W. 969; Gibbs v. Johnson, 63 Mich. 671, 30 N. W. 343; Trustees of Schools v. Scheik, 119 Ill. 579, 8 N. E. 189, 192; Woodman v. Calkins, 13 Mont. 363, 34 Pac. 187, 40 Am. St. Rep. 449; United States Fidelity & Guaranty Co. v. Union Trust & S. Co., 142 Ala. 532, 38 South. 177; Lovejoy v. Isbell, 70 Conn. 557, 40 Atl. 531; Johnson v. Johnson, 31 Ohio St. 131; San Roman v. Watson, 54 Tex. 254. There was no error in the holding of the court below that the failure of the principal to sign the bond of the Illinois Company did not relieve it from liability thereunder.

[2] 2. Were the individual sureties on the treasurer's bond for $10,000 exempt from liability for his defaults after the expiration of one year from the approval of the bond? The term of the treasurer's office was two years from January 1, 1907. The bond was dated, executed, and approved on April 2, 1907. It was in the same form as were those of the Surety Companies. It complied literally with the requirements of section 1183 of the statutes of Iowa, and it contained no limitation of liability to any particular fund or to any other time than the duration of the treasurer's office, so that on its face it clearly bound the sureties upon it to indemnify the county for any defaults of the treasurer between April 2, 1907, and January 1, 1909. The defalcations in issue occurred during the last six months of the treasurer's term, and these sureties claim exemption from liability

therefor: (1) Because the record of the board of supervisors is that on January 7, 1907, "on motion the following official bonds were approved, George L. McAllister, treasurer, $50,000," on January 8, 1907, "it was moved and seconded that the county treasurer furnish an additional bond of $10,000 for the ensuing year. Carried." On January 18, 1907, "on motion the bond of the county treasurer was fixed at $60,000 for the ensuing year," and on April 3, 1907, "the additional bond of George L. McAllister for $10,000 was read and on motion ordered approved." And (2) because the sureties produced parol evidence that before the bond was executed the supervisors called for a bond for the term of one year to cover collections for drainage matters, informed the treasurer and these sureties of this fact, and all parties so understood the purpose of the bond.

But the fact that the board fixed the amount of the bonds of the treasurer at $60,000 for the ensuing year and called for the bond for $10,000 for the ensuing year cannot be effective to limit, modify, or set aside the clear terms of the subsequent contract between the sureties and the county. That contract was not made until more than two months after these motions had been adopted by the board. It was effected by the tender of the bond and its acceptance and approval by the board of supervisors on April 2, 1907. In that contract all previous calls, demands, negotiations, and understandings of the parties were merged, and the accepted bond became incontrovertible evidence of the terms of their agreement. This bond was one of those which, together with the two bonds of the Surety Companies, made up the $60,000 fixed by the board. The statute required this bond to be conditioned that the treasurer would "account for the balances in his hands at the termination of his office." The bond was so conditioned, and the termination of the treasurer's office was more than 20 months after the bond was accepted, so that both by the terms of the statute and by the expressed terms of the bond these sureties contracted to indemnify the county for all defaults of their principal during the remainder of his term of office. A bond of an officer is for the remainder of his term, where no time is mentioned therein; much more is it so where the bond itself expressly so stipulates. County of Wapello v. Bigham, 10 Iowa, 39, 42, 74 Am. Dec. 370; South Carolina Society v. Johnson, 1 McCord (S. C.) 41, 10 Am. Dec. 644; Bigelow v. Bridge, 8 Mass. 275. The term of the bond of an officer to a county fixed by the statute and expressed in the bond may not be shortened, changed, or avoided by the fact that the county board before the bond was made or accepted called for a bond with a shorter term.

Nor was the parol evidence that, before the contract was made or delivered, the members of the board of supervisors informed the treasurer and the sureties, and all these parties understood, that the bond was demanded and made to cover collections on account of drainage matters during the ensuing year only, adequate to warrant any limitation or modification of its plain terms. In the absence of fraud or mistake, this evidence was incompetent because all the previous negotiations, statements, and promissory representations of these parties

were merged in the written contract, which is conclusive evidence of the nature and extent of their undertaking. Wilson v. New United States Cattle Ranch Co., 20 C. C. A. 244, 249, 73 Fed. 994, 999; Baxter v. Billings, 28 C. C. A. 85, 83 Fed. 790.

[3] The execution of the bond was not induced by fraud, and there is no proof of such a mistake in its draft or execution as can successfully appeal to the conscience of a chancellor. The sureties knew the form and the terms of the official bonds required by the statute, for they must have known the law. The bond they signed was such a bond. They could read. If they read it, they knew it bound them for the default of the treasurer throughout his term of office, and if they failed to read it that was their fault, and as against others who had a right to rely upon it and in reliance upon it disadvantageously changed their position these sureties are estopped from denying that they knew the terms of this bond. They made it, they caused it to be filed on the public records, and they let it stand concurrently with the bonds of these Surety Companies as an indemnity for their just share, one-sixth, of any loss the county might sustain through the default of the treasurer. Nothing but conscience, good faith, and reasonable diligence move a court of equity to grant relief to a complainant. And the case against the Surety Companies which the evidence for these individual sureties presents under their cross-bill, which was not filed until long after the defalcation of the treasurer and the expiration of his term, for a reformation of the plain terms of their bond so as to relieve them from liability for one-sixth of the treasurer's defalcation and to cast it upon the Surety Companies, is so devoid of equity and discloses such a lack of diligence in their failure to read the bond and to discover the mistake they allege when they signed it, and such a lack of diligence in their failure to investigate, discover, and bring suit to remedy it for more than two years after the bond was filed and until many months after the defalcation, that no relief ought to be or can be lawfully granted to them by a court of equity. As against the Surety Companies the individual sureties are liable under their bond for one-sixth of the loss that has been or shall be sustained by the county by reason of the defalcation of the treasurer.

3. Was the allowance to the sureties of a preferential payment of $3,132.21 just and equitable? This allowance is assailed by the receiver of the bank on the ground, among others, that none of the funds or of the proceeds of the funds of the county came to his hands, and by the Surety Companies on the ground that the court should have decreed a preferential payment to them of the entire claim of the county against the bank because its funds had been used to augment the assets of the bank which came to the hands of the receiver. In the litigation of this claim of preference the rights of the sureties are the same as those of the county, because the former must pay the deficit of the treasurer, and the terms "sureties" and the "county" will be used interchangeably in the discussion of the questions here presented.

The bank was hopelessly insolvent, and its president and cashier knew that fact and continued to receive deposits from June 11, 1908,

until October 17, 1908, inclusive, when it failed.   When it closed its doors on that day, it had failed to pay out on the orders of the treasurer or to return $25,801.21 of the amounts credited by it to the county for deposits made during that time.   During the same time other depositors had paid into this bank more than $800,000, and when it failed it owed to other depositors $343,277.27.   Applying the settled rule that, in the absence of affirmative evidence to the contrary, where payments are made out of a common fund, the presumption is that the earliest in are the earliest out, the fact is established that all the deposits made prior to June 11, 1908, had been drawn out, and those remaining in the bank were deposits of those depositors who had been deceived and defrauded into leaving their moneys with the bank between June 11, 1908, and October 18, 1908, after the president and the cashier knew the bank was hopelessly insolvent, but still received deposits on the faith of its apparently solvent condition.   The claims allowed against the bank aggregated $409,105.45, so that the record is that four-fifths of the amount owing by the bank is for deposits made by creditors while the officers of the bank knew it was insolvent. All the deposits remaining, therefore, those of the individual depositors and those of the county alike, the bank had unlawfully deceived and defrauded these depositors into making by its appearance of solvency when it knew it was insolvent, and it received and held them all in trust for their respective depositors.   The deposits of the bank were also charged with a trust for the county because the bank knew that the county treasurer deposited them with it without authority and in violation of a penal prohibition of the statutes.   Statutes of Iowa 1897, § 1457.   But the trust with which the funds of the other depositors was charged by the fraud committed upon them by accepting their money when the bank knew it was insolvent was as sacred as that imposed upon the funds of the county by the fact that the bank knew they were deposited in violation of a penal statute, and the latter fact entitles the county to no preference over the other depositors in the payment out of the proceeds of the bank of the moneys it deposited.

[4] A cestui que trust who is the equitable owner of his fund for one sound reason is as much entitled to it as another who is the equitable owner of his fund for many sound reasons, and the latter is entitled to no preference over the former in payment out of a common fund in which the trustee has commingled them.   Cherry v. Territory, 17 Okl. 213, 89 Pac. 190, 192.

[5] This is a suit in equity against the receiver of a national bank to require him to take from the ratable dividends of other creditors of the bank the requisite amount to pay the county's claim in full. The receiver must make the distribution of the property of this bank in accordance with the provisions of the national banking law.   It is the dominant purpose and requirement of that law that, after provision for a redemption of its notes is made, the proceeds of an insolvent national bank shall be equally distributed among its unsecured creditors.   So imperative is this provision that it repeals a former act of Congress giving a preference to the United States and annuls a statute of a state giving a preference to deposits of savings banks.

Rev. St. § 5236 (U. S. Comp. St. 1901, p. 3508); Davis v. Elmira Savings Bank, 161 U. S. 275, 285, 16 Sup. Ct. 502, 40 L. Ed. 700; National Bank v. Colby, 21 Wall. 609, 613, 614, 22 L. Ed. 687. The burden, therefore, is on the sureties to prove clearly that they are entitled on equitable principles to the preference they seek. They proved that the bank took the deposits of the county and of its other depositors in trust for them respectively. But this was not enough. They were also required to prove that these deposits or their proceeds, or a certain part of them, came to the hands of the receiver, for he is liable to cestuis que trustent to pay trust funds in full only to the extent that he receives them. How do the sureties claim to have made this proof? They argue that, as the bank received other deposits and earned profits sufficient to pay its operating expenses, the deposits of the county necessarily augmented the general assets which came to the hands of the receiver, and that this fact entitles them to have their claims paid in full out of the proceeds of the property of the bank in preference to its general creditors. The position is not without support in many remarks and in some decisions of the courts. Beard v. Independent District of Pella City, 31 C. C. A. 562, 88 Fed. 375; City of Spokane v. First National Bank of Spokane, 68 Fed. 982, 16 C. C. A. 85; Smith v. Township of Au Gres, Michigan, 150 Fed. 257, 261, 80 C. C. A. 145, 9 L. R. A. (N. S.) 876; San Diego County v. California Nat. Bank (C. C.) 52 Fed. 59; Page County v. Rose, 130 Iowa, 296, 299, 106 N. W. 744, 5 L. R. A. (N. S.) 886, 8 Ann. Cas. 114; Lucas County v. Jamison (C. C.) 170 Fed. 338, 347; American Can Co. v. Williams, 178 Fed. 420, 423, 101 C. C. A. 634; St. Louis, etc., Ry. Co. v. Johnston, 133 U. S. 566, 576, 578, 10 Sup. Ct. 390, 33 L. Ed. 683; Richardson v. New Orleans Coffee Co., 102 Fed. 785, 788, 789, 43 C. C. A. 583; Western German Bank v. Norvell, 134 Fed. 724, 726, 69 C. C. A. 330. But the contention cannot be sustained on either reason or authority. A deliberate consideration of the questions this phase of this case presents and a re-examination of authorities have convinced that these are the rules by which claims of this nature to preferential payments out of the proceeds of the property of an insolvent must be adjudged:

(1) It is indispensable to the maintenance by a cestui que trust of a claim to preferential payment by a receiver out of the proceeds of the estate of an insolvent that clear proof be made that the trust property or its proceeds went into a specific fund or into a specific identified piece of property which came to the hands of the receiver, and then the claim can be sustained to that fund or property only and only to the extent that the trust property or its proceeds went into it. It is not sufficient to prove that the trust property or its proceeds went into the general assets of the insolvent estate and increased the amount and the value thereof which came to the hands of the receiver. Peters v. Bain, 133 U. S. 670, 693, 694, 10 Sup. Ct. 354, 33 L. Ed. 696; Spokane County v. First Nat. Bank, 68 Fed. 979, 982, 16 C. C. A. 81, 84; Board of Com'rs v. Patterson (C. C.) 149 Fed. 229; Frelinghuysen v. Nugent (C. C.) 36 Fed. 229, 239; Board of Com'rs v. Strawn, 157 Fed. 49, 51, 84 C. C. A. 553, 555, 15 L. R. A. (N. S.) 1100; Lowe

v. Jones, 192 Mass. 94, 101, 78 N. E. 402, 6 L. R. A. (N. S.) 487, 116 Am. St. Rep. 225, 7 Ann. Cas. 551; Cherry v. Territory, 17 Okl. 213, 89 Pac. 190; St. Louis Brewing Ass'n v. Austin, 100 Ala. 313, 13 South. 908; Little v. Chadwick, 151 Mass. 109, 23 N. E. 1005, 7 L. R. A. 570; Howard v. Fay, 138 Mass. 104; Attorney General v. Brigham, 142 Mass. 248, 7 N. E. 851; Erie Ry. Co. v. Dial, 140 Fed. 689, 72 C. C. A. 183; Ferchen v. Arndt, 26 Or. 121, 37 Pac. 161, 29 L. R. A. 664, 46 Am. St. Rep. 603; Blake v. State Savings Bank, 12 Wash. 619, 41 Pac. 909, 910; In re North River Bank, 60 Hun, 91, 14 N. Y. Supp. 261; Williams v. Van Norden Trust Co., 104 App. Div. 251, 257, 93 N. Y. Supp. 821; Bishop v. Mahoney, 70 Minn. 238, 73 N. W. 6; Nonotuck Silk Co. v. Flanders, 87 Wis. 237, 58 N. W. 383; Burnham v. Barth, 89 Wis. 362, 366, 62 N. W. 96; Bradley v. Chesebrough, 111 Iowa, 126, 82 N. W. 472; Lebanon Trust & Safe Deposit Bank's Assigned Estate, 166 Pa. 622, 31 Atl. 334; Marquette Fire Com'rs v. Wilkinson, 119 Mich. 655, 670, 78 N. W. 893, 44 L. R. A. 493; Hauk v. Van Ingen, 196 Ill. 20, 39, 63 N. E. 705; Ellicott v. Kuhl, 60 N. J. Eq. 333, 46 Atl. 945; Ober v. Cochran, 118 Ga. 396, 45 S. E. 382, 98 Am. St. Rep. 118; In re Mulligan (D. C.) 116 Fed. 715, 717, 718; Holmes v. Gilman, 138 N. Y. 369, 376, 34 N. E. 205, 20 L. R. A. 566, 34 Am. St. Rep. 463; In re Hicks, 170 N. Y. 195, 198, 63 N. E. 276.

[6] (2) Proof that a trustee mingled trust funds with his own and made payments out of the common fund is a sufficient identification of the remainder of that fund coming to the hands of the receiver, not exceeding the smallest amount the fund contained subsequent to the commingling (Board of Com'rs v. Strawn, 157 Fed. 49, 51, 84 C. C. A. 553, 555, 15 L. R. A. [N. S.] 1100; Weiss v. Haight & Freese Co. [C. C.] 152 Fed. 479; American Can Co. v. Williams, 178 Fed. 420, 423, 101 C. C. A. 634, 637), as trust property, because the legal presumption is that he regarded the law and neither paid out nor invested in other property the trust fund, but kept it sacred (Board of Com'rs v. Patterson [C. C.] 149 Fed. 229, 232; Spokane County v. First National Bank, 68 Fed. 979, 16 C. C. A. 81).

[7] (3) For the same reason the legal presumption is that promissory notes, bonds, and other property coming to the hands of the receiver were not procured by the use of, and are not, trust property. Spokane County v. First Nat. Bank, 68 Fed. 979, 980, 16 C. C. A. 81, 82.

[8] (4) Where a trustee has mingled in a common fund the moneys of many separate cestuis que trustent and then made payments out of this common fund, the legal presumption is that the moneys were paid out in the order in which they were paid in, and the cestuis que trustent are equitably entitled to any allowable preference in the inverse order of the times of their respective payments into the fund.

The claim of the sureties for a preferential payment of the amount of the claim of the county against the bank because the county's moneys augmented the general assets that came to the hands of the receiver is forbidden by the first rule. They next claim that they are entitled to a preferential payment of about $12,000: (1) Because $4,-

455.05 was owing on notes discounted by the bank between June 11, 1908, and October 17, 1908, which came to the hands of the receiver; but the claim to such an allowance on account of these notes is forbidden by the third rule and by the fact that there is no evidence tracing any of the county's deposits or any of the proceeds of them into any of these notes. (2) Because the receiver collected $1,763.77 from credits to the First National Bank in other banks; but no preference on this account may be allowed for the same reasons. And (3) because $5,912.05 in cash came to the hands of the receiver when the bank failed. But the allowance of a preference on this account is forbidden by the fourth rule and by these facts: All the deposits of the county were made prior to October 10, 1908, except a deposit made on that day of tax receipts aggregating $1,041.22 and checks of third persons aggregating $486.11, and a deposit made on October 17, 1908, of $1,604.88 in checks. It was for these two deposits that the preference of $3,132.21 was allowed to the sureties by the court below. But this record has been searched in vain for any evidence that the checks for the $1,604.88 deposited on the last day the bank was open ever went into the hands of the receiver, and no claim is made to recover these checks. Nor can any evidence be found sufficient to show what banks these checks were drawn upon, or that any moneys derived from them ever went into the $5,912.05, or into the hands of the receiver. Proof that these checks augmented the cash that went into the hands of the receiver, or that they produced cash which he obtained, was indispensable to any preference on their account.

[9] But checks of third persons on the bank with which they are deposited which are paid by crediting the bank and charging the drawers on its books fail to increase the cash in its possession and form no basis for a preferential payment to the depositor. Beard v. Independent District of Pella City, 88 Fed. 375, 382, 31 C. C. A. 562.

[10] Moreover, the deposit of checks of third persons which are credited to the depositor and used by the bank to pay its debts bring no money into its fund of cash and form no foundation for preferential payment to the depositor. City Bank v. Blackmore, 75 Fed. 771, 773, 21 C. C. A. 514.

[11] Again, checks of third parties deposited with a bank credited to the depositor and collected through a clearing house lay no foundation for a preferential payment, in the absence of proof of the actual balance of cash the bank received on account of them, for they may have been and usually are used in whole or in part to discharge the debts of the bank. In re Seven Corners Bank, 58 Minn. 5, 59 N. W. 633; City of St. Paul v. Seymour, 71 Minn. 303, 308, 74 N. W. 136; Willoughby v. Weinberger, 15 Okl. 226, 229, 79 Pac. 777.

These checks may have been, and the probability is much greater that most of them were, used for some of these purposes than it is that cash for them was paid into the bank and remained there at the close of the day and went into the hands of the receiver. The sureties failed, therefore, to prove that any, much less how much, cash went into the $5,912.05 from the proceeds of these checks, and for that

reason alone they were not entitled to a preference on account of this deposit.

For the same reason they were entitled to no preference on account of the deposit of the checks and tax receipts on October 10, 1908. There is no evidence how much, if at all, these papers augmented the cash in the bank, much less that any cash it derived from them remained in the $5,912.05 that went into the hands of the receiver seven days later. On the other hand, it is certain that it did not, for the proof is conclusive that more than $8,000 was deposited in the bank subsequent to October 10, 1908, and more than $20,000 was drawn out. All these deposits were trust funds, and applying the rules that deposits of equal trust rank are presumed to be drawn out in the order they are paid in, and that allowable preferences in the remaining balance must be given in inverse order of their payment to the trustee, all of the deposits of the 10th of October had been drawn out long before October 17, 1908, and the $5,912.05 was the property of later depositors.

[12] It is true, as suggested by counsel, that the individual depositors who put these deposits into the bank after June 11, 1908, have not claimed preference in payment out of the proceeds of their funds. But they are represented here by the receiver, who objects on their behalf that they are cestuis que trustent equally with the county, and that, while they are content in view of the fact that four-fifths of the claims against the bank are by claimants of this class to share the proceeds of its insolvent estate equally with all claimants, they protest against the taking of a share of their dividends to pay other cestuis que trustent of only equal rank in full. These sureties are appealing for their preferences to a court of equity which may and ought to require those who seek equity to do equity. And when, as in this case, the entire record shows that the allowance of a claim for a preferential payment out of the proceeds of an insolvent estate will be inequitable and unjust to the great majority in number and in amount of the creditors of the estate whose claims are equal in law and in merit to that pressed for preference, while the denial of this preference will violate no rule of law or of equity and work no injustice, but will tend to preserve that equality which is equity, the claim presents no equity and makes no appeal to the conscience of the chancellor for its allowance, and it must be denied. Cherry v. Territory, 17 Okl. 213, 89 Pac. 190, 191. The county and the sureties are entitled to no preference in payment out of the proceeds of the property of the bank.

4. Was the Chicago & Northwestern Railway Company entitled to preference in the payment of $1,895.80 allowed to it by the decrees below? This allowance is based on the facts that the Railway Company bought of the bank four drafts on other banks which were never paid and which there was no money with the drawees to pay, while the bank was insolvent and its officers knew these facts. The Railway Company paid for these drafts as follows: On October 13, 1908, it bought a draft for $536.08 for which it paid $364.27 in cash and $171.81 in checks of third parties on other banks. On October 14, 1908, it bought a draft for $624.70 for which it paid in cash $377.76

and in checks of third parties on other local banks $112.67 and in checks of such parties on the First National Bank $134.27. On October 16, 1908, it bought a draft for $741.62 for which it paid in cash $571.68 and in checks of third parties on other local banks. $170.04. On October 17, 1908, it bought a draft for $150.08 for which it paid in cash $119.52, in checks of third parties on other local banks, $8.15, and in checks of third parties on the First National Bank $22.41. The court below found that the aggregate amount of these payments in cash and in checks on other banks, which was $1,895.80, constituted a fund held in trust by the bank for the company; that this fund augmented the general assets of the estate which came to the hands of the receiver by that amount; and that the Railway Company was entitled to a preference in its payment. Conceding that the amounts paid to the bank for these drafts constituted, at the times they were respectively received, funds held by the bank in trust for the Railway Company, it was not sufficient to sustain a preference that the estate coming to the hands of the receiver was augmented thereby. It was indispensable to a preferential payment that these amounts should be traced by adequate proof into some specific fund or property which came to the receiver's possession. The only property that came to the hands of the receiver that there is any evidence tending to show that any part of the amounts paid for these drafts went into is the cash fund of $5,912.05 which was turned over to the receiver when the bank closed. On October 17, 1908, 26 parties deposited $4,319.19; on October 16, 1908, 16 parties deposited $1,169.62; and on October 15, 1908, 27 parties deposited $2,719.79—making the aggregate deposits during the three last days of the bank's operation $8,208.60. These deposits were trust funds to the same extent as the payments by the Railway Company, for they were induced by like acts of the officers in fraudulently receiving them into the bank when they knew it was insolvent. During these three days more than $20,000 was paid out by the bank. Applying the rules that, in the absence of counter proof, payments out of a common fund composed of commingled trust funds are presumed to draw them out in the order of time in which they were paid in, it is certain that none of the Railway Company's payments on the 13th and 14th of October went into the $5,912.05 left on the night of October 17, 1908, because all payments into the cash of the bank prior to the 15th had been drawn out, and the remnant was composed of the deposits and payments into the bank on the 15th, 16th, and 17th of October, and those who made these payments were entitled to preferential payment in the inverse order of the times of their making. Under the latter rule, the parties who deposited the $4,319.19, and the Railway Company which paid in the $119.52 in cash on October 17th, are entitled to $4,438.71 of this $5,912.05, and there remained $1,473.24 to be applied to the deposits and payments into the bank on October 16th. On that day there were deposited $1,169.62, and the Railway Company paid in $571.68 in cash, making in all $1,741.30. There is no evidence in what order of time the payment of the Railway Company and the deposits on that day were made; but, if the deposits were made after the payment, there

remained the difference between $1,473.24 and $1,169.62, or $303.62 of the moneys paid in by the Railway Company which must have gone into the $5,912.05 which came to the hands of the receiver. The burden was on the Railway Company to prove the order of time of the payment and the deposits and the amount of the preference to which it was entitled. It has failed to prove that it was entitled to more than $423.14, and the decrees should have adjudged a preferential payment to it of that amount and no more. In this computation and statement the checks of third parties paid into the bank by the Railway Company have been disregarded because the cash paid in on the 16th and 17th exceeds the amount allowable to the Railway Company under the law and the evidence, and it is immaterial whether the checks were paid by a discharge of debts of the bank or by an actual payment of cash into its vaults.

[13] 5. At the hearing in this court its attention was called to the fact that after the decrees in these cases had been rendered, and before the time for appeal had expired, the Railway Company and the receiver, without the consent of the Empire Company or the court, or of the other parties to the suit, agreed to compromise the claim of the Railway Company for preferential payment by allowing it a preferred claim for $1,433.23 and a general claim for $619.25. But when that agreement was made, the Empire Company, in these two suits, in one of which it was complainant and the receiver and the Railway Company were defendants, and in the other of which the Railway Company was complainant and the Surety Company and the receiver were defendants, had invoked the jurisdiction of the federal courts to determine the validity and extent of this preferential claim, and those suits were pending and were not finally determined. Within the time allowed by the act of Congress the Empire Company appealed to this court and assigned the allowance of the Railway Company's preferential claim as error in each case. The Surety Company was interested in that allowance and aggrieved thereby, for its effect was to diminish the dividend on its claim. It therefore had the right to a review of that allowance by appeal from the decrees which made it and its right of appeal was absolute, so absolute that the Circuit Court could not have deprived it of its right, much less could the receiver or any of the other parties to these suits. Simpson v. First National Bank, 129 Fed. 257, 259, 63 C. C. A. 371, 373; McCourt v. Singers-Bigger, 150 Fed. 102, 104, 105, 80 C. C. A. 56, 58, 59.

Moreover, as soon as the issue of the validity and extent of this preferred claim arose between the Empire Company on the one side and the receiver and the Railway Company on the other, the jurisdiction of this court to review the decision of that issue and finally to determine it attached. And conceding that, in the absence of a suit pending against him concerning a claim for preference, the receiver of a national bank may lawfully compromise and settle it, it is too late for him to do so, without the consent of all the interested parties to the suit or an order of the court, after the courts have acquired jurisdiction of the claim in a suit to which he is a party.

194 F.—39

It is beyond the power of a receiver of a national bank who is a party to a decree allowing a preferred claim in a suit between a creditor of the bank, who is entitled to appeal from it, and himself and the claimant, to deprive the creditor of his right to appeal from the decree and this court of its jurisdiction to review it by compromising it with the claimant without the consent of the creditor or the order of the court. Barber Asphalt Pav. Co. v. Morris, 132 Fed. 945, 953, 66 C. C. A. 55, 63, 67 L. R. A. 761. The decrees should establish the preferred claim of the Railway Company for $423.14, its general claim for the balance of the amounts it paid for its drafts, and should require it to pay back to the receiver the amount, if any, it has received in excess of the amount to which it was entitled upon this basis.

The result is that the decrees of September 30, 1910, and the supplemental decree of November 3, 1909, must be reversed, and these cases must be remanded to the District Court, with instructions to enter decrees in accordance with the views expressed in this opinion.

Let the Empire Company recover costs from the Railway Company in No. 3,357, and let the costs in Nos. 3,358 to 3,364, inclusive, be so divided that one-eighth thereof shall be paid by the Empire Company, three-eighths thereof by the Illinois Company, one-eighth thereof by the receiver, one-eighth thereof by the Railway Company, and two-eighths thereof by the individual sureties.

HOOK, Circuit Judge. With one exception, I concur in the results reached in the foregoing opinion, though not in every respect with the reasoning. The exception is in the case of the Railway Company. When the bank failed, the Comptroller of the Currency at once took charge, appointed a receiver, and proceeded with the liquidation of its affairs. The Railway Company asserted and was decreed by the Circuit Court to have a preferential claim upon funds in the receiver's hands. The receiver did not appeal, but, acting under the direction of the Comptroller, compromised and settled the claim of the Railway Company at less than the amount of the decree. The sum agreed on was paid. The Empire Surety Company, which by the way was not a direct creditor of the bank, but simply a surety for a county treasurer who had lost public funds by unlawfully depositing them in the bank, appealed from the decree. The appeal was taken after the settlement with the Railway Company. The point of my dissent is here: The action of the Comptroller, whose authority in such cases under the statutes of the United States is well known and need not be enlarged upon, puts the right of the bank upon a ground wholly independent of the decree, and the court should not now require the repayment of the money. Any different rule would enable a single creditor, a common nonlien creditor for that matter, which at the most the Surety Company was, to thwart the power of the Comptroller and his duty speedily to administer the affairs of an insolvent national bank, by merely beginning a suit in equity and making all claimants to preferences parties defendant. Indeed, if my Brothers are right, it would seem to follow that a creditor of an insolvent national bank might commence a suit to marshal its assets and so compel the Comp-

troller to sit by and await the termination of the litigation before he could exercise his statutory powers with respect to the allowance and payment of claims. Within his power the Comptroller or his receiver is the representative of all the creditors.