## In re A. O. BROWN & CO.

### Ex parte SMART.

(District Court, S. D. New York. December 30, 1910.)

BANKRUPTCY (§ 140*)—MONEY RECEIVED BY BANKRUPT AS BROKER—TRUST.

Claimant ordered bankrupts, as brokers, to purchase for him certain stocks, and, on being advised that the purchase had been made, paid bankrupts for the same. Bankrupts ordered the stock to be bought by another firm of brokers, which was done on the floor of the exchange. On the same day bankrupts ordered the same amount of the same stock sold for another customer, which was also done. The two firms settled the transactions by setting off one against the other and the payment of the difference. *Held* that, to entitle claimant to rescind the purchase and follow the purchase money paid as a trust fund, he was required to show that bankrupts did not actually receive the stock purchased for him, and that such burden was not sustained by proof that the stock was not delivered to him and did not come into possession of the bankrupt's receiver or trustee, nor by further proof that bankrupt's selling customer was selling "short," and did not deliver the stock sold to bankrupts prior to the bankruptcy, since under the rules of the exchange bankrupts were required to borrow the stock to make delivery to the purchaser, and it did not appear that the stock was not in fact borrowed in this case for delivery to claimant and afterward converted by the bankrupts.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

In the matter of A. O. Brown & Co., bankrupts. On petition by Allen R. Smart to reclaim money as a trust fund. Denied.

Ralph Wolf, for claimant.
Kenneth MacKenzie, for petitioner.

HAND, District Judge. In re Brown, Ex parte Horrocks & Wilkin (just decided by the Circuit Court of Appeals) 185 Fed. 766, controls this case, except for one fact, which is this: The proof here is that the customer whose sale of stock "cleared" the claimant's purchase was selling "short," was always heavily indebted to the broker, and never "covered" his "short" sale before the bankruptcy. This requires one step further in the analysis than was required in Ex parte Horrocks, supra. Under that case it did not appear whether or not the brokers actually received from the selling customer a certificate of stock, and the court held that it was necessary to show that they did not, because, if they did, that certificate became the property of the buying customer, just as the buyer's money went to the seller. Now, under Ex parte Horrocks, supra, the same result arises, even though the seller be a "short" seller; that is, in case he owns no stock himself. In that case the broker, as his agent, must get a contract from some one else—always, in fact, another broker—to lend him the needed stock, and he must agree to pay money to that lending broker as collateral pending the loan. This stock the seller's broker must actually receive at the time fixed for deliveries upon his exchange, in order to perform his contracts made

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

with other members of that exchange. The usual time is upon the following day in this country.

It is true that the obligation of the lending broker to lend the stock will itself figure in the general set-off at the end of the day, so that, if there were a third customer who actually had a certificate which he had contracted to sell through the borrowing broker, his certificate would remain undelivered, and his contract to sell would cancel the delivery of stock by the lending broker. For example: Suppose there are three customers, A., B., and C. A. is a buyer, B. and C. are sellers, each, of 100 shares. C. has an actual certificate; B. is selling "short." The broker makes four contracts relating to stock: He makes a contract of purchase for A.; two contracts of sale, one for B., one for C.; and a contract to borrow from another broker for B. At the end of the day his contract to buy and one of his contracts to sell mutually cancel each other, because they require reciprocal acts; but he remains bound to deliver 100 shares on the second contract of sale, and to receive 100 shares on the contract to borrow. These two contracts similarly mutually cancel each other, and C.'s 100 shares remain in the broker's possession; the property, however, of A. Unless the broker has become insolvent, therefore, he must upon the day fixed for deliveries always have the requisite number of shares in his custody to answer all purchases.

Nor does it make any difference whether the selling customer, as here, was always indebted, and never "covered" the "short" sale. That only means that, after the broker has borrowed the stock for the "short" seller by paying the lending broker enough money to secure him for the loan of it, the "short" seller remains bound to get back the stock, so as to repay the loan and receive his money collateral. The fact that he may never do this does not change the fact that his sale was a real sale, so far as the Stock Exchange went, and that there was an actual certificate delivered or retained to meet the broker's obligation to deliver to the buying customer whose contract of purchase "cleared" the "short" seller's unfulfilled contract of sale.

Therefore the only way in which the claimant could escape the effect of Ex parte Horrocks, supra, was to show that, when Whitney sold the stock "short," the bankrupts did not borrow the requisite certificate that day. As it subsequently transpired, they might have omitted safely to do so, because there was on that day a "clearance" of his sale by the claimant's purchase. Still it was impossible to tell that this would be so, when Whitney's contract of sale went in, and the custom is the other way. Besides, it rested on the claimant to prove that fact, in order to avoid the effect of In re Brown & Co., Ex parte First National Bank of Princeton, 175 Fed. 769, 99 C. C. A. 345, and he has not done so. For aught that appears the brokers did have the stock, or control of it, at the end of the day. That is enough to avoid a conversion. In re McIntyre, Ex parte Niven, 174 Fed. 627, 98 C. C. A. 381. And by a similar reasoning it would be enough here to amount to an execution of the order. Whatever

happened afterwards to that stock, the claimant has only it, or its proceeds, to look to, and he has tried to follow neither.

Therefore I conclude that he has not sustained the burden of proof, either of showing that his order was never executed, or of following his property. The petition must be denied.

This renders unnecessary any consideration of the claim of Laura E. Jackson, as there is now enough for her claim.