## In re J. F. PIERSON, JR., & CO.

### (District Court, S. D. New York.   July 24, 1915.)

1. BANKRUPTCY ⬅140—BROKERS—RIGHTS OF CUSTOMERS.

Where a bankrupt stockbroker did not have in his possession free and clear stock equal to the claims of all customers for whom he had purchased stock, none of the customers could reclaim any part of the stock on hand, or any part of the equity in such loans as had among their collateral the remaining stock, though, where he had in his possession stock free and clear sufficient to satisfy all the customers, it would be presumed that he had purchased it to keep good his obligations to the customers, who could reclaim the stock.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. ⬅140.]

2. BANKRUPTCY ⬅140—BROKERS—RIGHTS OF CUSTOMERS.

A customer of a bankrupt stockbroker, who showed that his account had a credit balance when the petition in bankruptcy was filed, but who could not trace his stock by certificate number into a loan secured by stock as collateral, had no superior equity, and could not reclaim any stock.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. ⬅140.]

3. BANKRUPTCY ⬅326—BROKERS—RIGHTS OF CUSTOMERS.

A customer of a bankrupt stockbroker, who could not trace stock purchased for him, and pledged for loans, was entitled to a set-off equal to the value of the stock when converted; and where the customer, having the burden to show the date of the conversion, did not show it as of any given date before date of bankruptcy, the value of the stock could be fixed as of that date.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 514; Dec. Dig. ⬅326.]

4. BANKRUPTCY ⬅140—BROKERS—RIGHTS OF CUSTOMERS.

A customer of a bankrupt stockbroker, who was credited with the proceeds of stock as of the date of bankruptcy in a sum sufficient to wipe out his debt, and which gave him stock free and clear, came within the preferred class, and could reclaim the stock; and where the equity of the loan was not enough, the deficiency must be borne by other customers, holding their stocks on a margin.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. ⬅140.]

5. BANKRUPTCY ⬅474—PROCEEDINGS TO RECLAIM PROPERTY—COSTS.

A customer of a bankrupt stockbroker, who found his stock in loans, while entitled to a credit balance, is not liable to pay any part of the disbursements in reclamation proceedings, and should have a docket fee; and since the bankrupt should have withdrawn the stock from the collateral, and so placed it as to enable the customer to get it without expense, the expenses arising from his failure to do so must be borne by the general creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 878–884; Dec. Dig. ⬅474.]

6. BANKRUPTCY ⬅476—PROCEEDINGS TO RECLAIM PROPERTY—COSTS.

Customers of a bankrupt stockbroker, carrying stocks on a margin, are not entitled to any docket fee in reclamation proceedings, for they gave the broker the right to pledge them as collateral with banks.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 898, 899; Dec. Dig. ⬅476.]

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. BANKRUPTCY ☞474—PROCEEDINGS TO RECLAIM PROPERTY—COSTS.

Customers of a bankrupt stockbroker, who seek to reclaim stock, but who fail altogether, should not bear any costs of an omnibus customers' reclamation proceeding, wherein other customers obtained relief.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 878–884; Dec. Dig. ☞474.]

In Bankruptcy. In the matter of the bankruptcy of J. F. Pierson, Jr., & Co. Omnibus customers' reclamation proceeding. Order advised.

William M. Parke, of New York City, for receiver.
Joseph J. Jacobs, of New York City, for Charles Greenberg.
Bayard L. Peck, of New York City, for Walter J. Quinn.
James Gillin, of New York City, for Howard S. Gott.
John C. Rowe, of New York City, for Charles McClair.
Irving L. Ernst, of New York City, for Patrick J. Ruddy, Joseph J. Ives, Pauline A. Buchholz, and Jared T. Kirtland.
Taylor, Jackson & Brophy, of New York City, for Morris Ritter.
Frank L. Boynton, of New York City, for Horace C. Stringfield.
William F. Unger, of New York City, for Laurence J. Levy, Hela Van Thyn, and Jules Vrieslander.

LEARNED HAND, District Judge. [1] Gorman v. Littlefield, 229 U. S. 19, 33 Sup. Ct. 690, 57 L. Ed. 1047, held that, when a broker had enough stocks in his box to meet all his obligations, it would be presumed that he had purchased them to keep good those obligations. Just what there was "revolutionary" in that doctrine I confess is not apparent to me, except that it reversed the rule theretofore obtaining for a short time in this circuit. Schuyler v. Littlefield, 232 U. S. 707, 34 Sup. Ct. 466, 58 L. Ed. 806, did not affect or modify this ruling in the least, but it did hold that the same rule did not apply to the replenishing of bank accounts. Re Leavitt & Grant, 215 Fed. 899, 132 C. C. A. 238. Re Hollins & Co., 219 Fed. 544, —— C. C. A. ——, held that the presumption did not apply, although the broker had enough shares of stock to meet all his obligations, if those shares were partly in loans, partly lent to a customer who had gone "short," and partly in his box. I do not think that anything turned upon the fact that part of the shares had been lent to another customer, instead of being pledged with a bank, because, when so lent, the broker gets in return a chose in action binding the customer to secure for him a corresponding number of shares. There is no indication in Re Hollins, supra, that the decision would have been different, had the shares of stock in the loans and in the box equaled the number required to fulfill the obligations to the customers. On the contrary, the whole discussion turns upon the number of shares which the brokers had free and clear and in their possession. I think the master was right in holding that this case limits Gorman v. Littlefield, supra, to cases where there is enough to go around "in the box." However, I wish to add that the language in Re Leavitt & Grant, supra, that Gorman v. Littlefield, supra, applied to securities "in the

box" was not intended so to limit that case, and was quite unnecessary to the decision.

The claimants urge that the doctrine of Re Hollins, supra, is wholly inconsistent with any logical application of the doctrine of Gorman v. Littlefield, supra. They say that, if the presumption exists, it is one of fact, arising from the probability that a broker has done what is honest, and that the Supreme Court put the doctrine upon that very ground. If, they add, the stock was intended to become the customers' as soon as the broker bought it, obviously no subsequent pledge can affect their rights in it as between him and them. If, they conclude, it should be urged that his subsequent pledge be thought to be evidence of his prior intent, when he bought it, to buy it for himself, not them, the answer is that his subsequent pledge was not inconsistent with an intent to buy for them, for he had the right to pledge customers' shares which they held on margin, at least for the amount of the margin. Once you assume that purchases of the necessary issues of stock are intended for customers, why, they ask, should you think them any the less so because you afterwards find them exactly where you would expect to find them, were your assumption true?

All such arguments, however, must be addressed only to the Circuit Court of Appeals, and can gain no hearing in this court. It therefore follows that, in all cases where the bankrupts did not have free and clear in their box an amount of stock equal to the claims of all customers, none of the customers may reclaim any part of what they did have on hand, nor any part of the equity in such loans as had among their collateral the remaining shares. This disposes of the claims of Joseph J. Ives, Patrick Ruddy, Pauline A. Buchholz, and Jared T. Kirtland.

[2] Quinn's claim is in the same category. He insists that his case is covered by Re Ennis, Ex parte Bamford, 187 Fed. 720, 109 C. C. A. 468, because his account showed a credit balance when the petition was filed. He would be quite right in his argument if he could trace his stock by certificate number into the loan in question. That was the assumption throughout in Ex parte Bamford, supra, an assumption the exact basis of which is not quite certain to me, but which I understand to rest upon an actual tally of the securities found in the loan. They were identically traced. We must remember, however, that under the rule of Re Hollins, supra, no presumption whatever of ownership arises unless there are enough shares "in the box," or unless the claimant can actually identify his shares by certificate number. Hence the condition is absent which would give Quinn the preference that Bamford got in his case. The decision in Re McIntyre, Ex parte Pippey, 181 Fed. 955, 104 C. C. A. 419, rests upon the same identification of securities as Ex parte Bamford, supra.

McClair's Case falls with Quinn's. McClair has not actually traced his certificate .099 bought on May 27, 1912, into the shares held by the American Exchange National Bank. On the contrary, it was delivered elsewhere. Hence, though he had a credit balance, he does not fulfill the condition realized in Ex parte Bamford, supra, and Ex parte Pippey, supra; he cannot trace or identify his stock.

Levy's Case follows the disposition of Ruddy's and the others first considered, and fails.

The claim of Van Thyn and Vrieslander also falls in the same category as Ruddy, except for the point of waiver. That can make no difference in the result, because it does no more than give to those who can trace their property the right to that property. As there is no property to reach, it cannot create what does not exist.

[3] Gott's claim raises an interesting question. The master has allowed him his National Enameling stock because he has traced the specific certificate. About that stock, therefore, there is no dispute. Yet he has held him indebted to the estate to an extent measured in part by crediting him with the value of his Sloss-Sheffield stock. Now, this stock, under the rule in Re Hollins & Co., supra, cannot be traced, because, although the bankrupts had enough stock to fill their orders, it was all pledged, and the pledge prevents the presumption from arising. If the Sloss-Sheffield stock in the loan is not Gott's, then it must have been converted at some prior time, or it can never have been purchased at all. As Gott is in any event entitled to a set-off equal to the purchase price, if the order was never executed, or to the value of the stock when sold, if later converted, there must be some period of time fixed for its value. The master has taken the value of Sloss-Sheffield stock on July 30, 1914, and allowed him for that. Such a finding can only rest upon the assumption that July 30, 1914, or later was the date of conversion, a pure assumption without evidence. Further, we have it on the authority of Re McIntyre, Ex parte Niven, 174 Fed. 627, 98 C. C. A. 381, that there is no conversion if the broker retains enough shares in the possession of another to meet his obligations.

Apparently, therefore, while the customer has no property in the certificates in the hands of others, the broker has not converted the stock, if there remain enough in such hands subject to his control to answer his obligations. If it appeared that there always was enough stock on hand, then there would never be a conversion, and we should be presented with the strange anomaly that while, under Ex parte Nevin, supra, the broker had never converted the stock, yet under Re Hollins & Co., supra, the customer had no property in any of the stock at hand. Such a situation, if it ever arise, would apparently present the necessity of yielding one doctrine or the other. However, that dilemma is not raised in the case at bar, because it does not appear that the bankrupts always had enough stock on hand, but only that they might have had. Since, under Ex parte Nevin, supra, the burden rests upon the customer to show the date of the conversion and since he has not shown it as of any given date before July 30, 1914, the master did the only thing open to him and took the value as of the date of bankruptcy. I do not forget that consistently, under Ex parte Nevin, supra, no conversion whatever has been shown. Logic would require that Gott should get neither stock nor any allowance for the value of the stock at any time; but there are limits of injustice to which consistency should not drive us, and this is one of them. Some value must be taken quite arbitrarily, and I can see no other which is less arbitrary than that adopted.

. It is quite clear that there is no warrant in fact for Gott's suggestion that no purchase was ever made, and therefore the rule does not apply of West v. McLaughlin, 162 Fed. 124, 89 C. C. A. 124.

Greenberg's claim falls with Ruddy's.

[4] Ritter's claim is a little better than the master has allowed. Having traced his stock specifically, he may recover it. However, his other stocks he does not get, and is credited with their proceeds as of July 30, 1914, a credit which is enough to wipe out his debt altogether and give him his Erie stock free and clear. He, therefore, comes under the rule of Ex parte Bamford, supra, and is in a preferred class. If the equity of the loan is not enough, the deficiency must be borne by the other claimants, provided they held their stocks on a margin. If any of them were in Ritter's position, and held stocks free and clear, they will also be in the preferred class.

[5] The last question is of the costs and disbursements. Those customers who, like Ritter, found their property in loans, while they were themselves entitled to a credit balance, ought not to be called on to pay any part of the disbursements, and should have a docket fee. The bankrupt, under Ex parte Bamford, supra, should have withdrawn their shares from the collateral, and put them in his box, where the customer should have been able to get them without expense. The expenses arising from his failure to do this are properly to be borne by his general creditors, who must take his place as he left it.

[6] Those customers who were carrying their stocks on a margin gave the broker thereby the right to pledge them as collateral with banks, and it may fairly be argued that the expense of disentangling the resulting rights they should bear in proportion to their eventual interests. I am clear that they should have no docket fee.

[7] Those claimants who fail altogether should not bear any costs. The proceeding is now remitted to the Special Master to prepare an order in accordance with this opinion. So far as I am aware, that order will follow the report, except in respect of the stock of Ritter and in the matter of disbursements.