**In re WALTER J. SCHMIDT & CO. Ex parte FEUERBACH. Ex parte HUNS-BERGER. Ex parte BONYNGE et al.**

(District Court, S. D. New York. November 12, 1923. Supplemental Opinion, December 7, 1923.)

**1. Trusts ☞358(2)—Rule for distribution of depleted trust fund.**

Where a trust fund, which has been depleted, is to be distributed, and the money of several claimants was deposited in the fund at different times, the equitable rule of distribution is that the claimant whose money was first deposited must bear the loss from depletion which occurred before the second deposit was made, and the owners of those two deposits, in proportion to their then interest in the fund remaining, must bear the loss from further depletion before the third deposit was made, and so on, leaving each some part of the fund finally remaining. The rule of authority, however, requires distribution in inverse order of the deposits; the last depositor being entitled to payment in full and the others in succession until the fund is exhausted.

**2. Bankruptcy ☞140(3)—Customers held not entitled to follow money paid for securities as trust fund.**

Where bankrupts, as brokers, bought securities for customers which were not fully paid for, and which they lawfully pledged as security for loans to themselves, payment by the customers to them of the amount remaining due for the securities was merely payment of a debt to bankrupts, and the customers could not follow the payments as a trust fund, but their only remedy was by tracing their securities or their proceeds.

**3. Bankruptcy ☞140(3)—Customer held entitled to reclaim securities wrongfully pledged.**

A customer, who bought securities on margin through bankrupts as brokers, with written consent that they might pledge the same on their own loans, but only on condition that they notify him of such intention, and whose securities, with others, were pledged without notice, *held* entitled to reclaim them without contribution to the owners of other securities, pledged with their consent, which were sold by the pledgee.

**4. Bankruptcy ☞140(3)—Customer cannot trace and recover sum paid for purchase of stock, after bankruptcy, without showing that the stock was not bought.**

To entitle a customer of brokers, after their bankruptcy, to trace and recover a sum paid to them for the purchase of a stock, he must show that the stock was not bought by them.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. **Bankruptcy** ⊝140(3)—**Receiver under no duty to sell property in his possession at owner's request.**

   A receiver for bankrupt brokers, who had in his possession shares of stock belonging to a customer of bankrupts, was under no legal duty to sell the same at the customer's request, and is not liable for a loss due to a decline in the market price after the request was made.

6. **Bankruptcy** ⊝474—**Expenses arising through wrongs of bankrupt must be borne by general estate.**

   Expenses of a reference, made necessary by a wrong of bankrupt, must be borne by the general estate.

In Bankruptcy. In the matter of Walter J. Schmidt & Co., bankrupts. Claims by one Feuerbach, one Hunsberger, and one Bonynge against funds and the estate considered and determined.

Sur exceptions to a special master's report in bankruptcy The bankrupts were stockbrokers doing business in New York. The petitioners were their customers, for whom they had bought various securities, which they pledged as collateral to their own loans with banks. In no case had the petitioners paid for the securities in full, and some had signed consents that the brokers might pledge all securities, regardless of the state of the customer's account, unless it were paid in full. The several petitioners make claim against the receiver for interests in various funds in his hands, asserting that they represent the proceeds of their securities. These claims were referred and disposed of by the special master.

Percival Jackson, of New York City, for receiver.
Paul M. Crandell, of New York City, for Schrader.
Arthur F. Egner, of Newark, N. J., for Salmond and others.
Curley C. Hofppauir, of New York City, for Bonynge.
William C. Foster, of New York City, for Feuerbach.
Lasenby & Biglow, of New York City, for Hunsberger.
A. A. Harriott, pro se.

### The Lincoln Trust Company Bank Deposit.

LEARNED HAND, District Judge. For various reasons not necessary to state the petitioners Schrader, Bonynge, and Salmond all have claims against the bank deposit in the Lincoln Trust Company, which the receiver recognzes as entitling them collectively to the whole of it as a trust fund. The only question is how it shall be divided between them. The special master upheld the claims of Cole, Bonynge, and Schrader, and divided the fund, under the authority of Empire, etc., Co. v. Carroll County, 194 Fed. 593, 114 C. C. A. 435, on the principle that the petitioner whose money was last deposited should withdraw from the fund first and so on in inverse order of deposit until the same is exhausted. To this Schrader, who comes last, objects, on the ground that the deposit should be ratably divided, and also because the claims of Cole and Bonynge were improperly allowed. Salmond's claim was not passed on, because, under the rule appllied, the fund was exhausted before he could withdraw.

[1] The rule adopted by the special master has indeed the support of considerable authority, but none of it is authoritative upon me. Empire, etc., Co. v. Carroll County, 194 Fed. 593, 114 C. C. A. 435; Hewitt v. Hayes, 205 Mass. 356, 365, 91 N. E. 332, 137 Am. St. Rep. 448;

⊝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Re Stenning [1895] L. R. 2 Ch. Div. 433; Knatchbull v. Hallett, L. R. 13 Ch. Div. 696. It depends upon charging withdrawals from a fund held by two joint cestuis que trustent against the earlier of the two, following or assuming to follow the rule in Clayton's Case, 1 Mer. 572. However, as pointed out by Professor Scott in 27 Harv. Law Rev. 130, note 15, the circumstances are wholly different. The rule in Clayton's Case is to allocate the payments upon an account. Some rule had to be adopted, and though any presumption of intent was a fiction, priority in time was the most natural basis of allocation. It has no relevancy whatever to a case like this. Here two people are jointly interested in a fund held for them by a common trustee. There is no reason in law or justice why his depredations upon the fund should not be borne equally between them. To throw all the loss upon one, through the mere chance of his being earlier in time, is irrational and arbitrary, and is equally a fiction as the rule in Clayton's Case, supra. When the law adopts a fiction, it is, or at least it should be, for some purpose of justice. To adopt it here is to apportion a common misfortune through a test which has no relation whatever to the justice of the case.

It does not follow, however, that the claimants should divide the fund in the proportions of their original deposits. An illustration will perhaps be clearest. Suppose three claimants, A., B., and C., for $5,000 each, whose money was deposited at intervals of a month, January, February, and March. Suppose that the fund had been reduced on some day in January to $3,000. A. has lost $2,000, which he cannot throw on B. Hence, when B.'s money is deposited on February 1st, A. and B. will share $8,000 in the proportion of 3 to 5. Suppose that during February the account gets as low as $4,000. A. and B. cannot throw this loss on C., and when C.'s money is deposited they will share the $9,000 in the proportion of 3, 5, and 10. But any subsequent depletion below $9,000 they must bear in that proportion, just as A. and B. bore theirs in February. At least, to me it would be a parody of justice if, out of a remainder, for example, of $7,000, C. should get $5,000, B. $2,000, and A. get nothing at all. Such a result, I submit with the utmost respect, can only come from a mechanical adherence to a rule which has no intelligible relation to the situation.

[2] Next, as to Schrader's challenge of Cole's and Bonynge's claims. Each of these customers had securities in the bankrupts' hands on which there were sums due. The bankrupts had hypothecated these with the bank, so far as appears, quite lawfully. Being desirous of taking them out of the account, each customer asked the amount of his debit balance and paid the balance due. The bankrupts cashed the checks and put the proceeds in the Lincoln Trust Company, where they were at the time of the receivership, or at least some part of them. It is against this fund that the claimants now seek to prove.

The situation is not new in the courts, and the claimants must lose. When the brokers actually received the securities for Cole and Bonynge, they became their property, and the purchase price, for which the brokers had become liable to the sellers, was due from the customers to them. In paying the money, they merely paid that debt to the brokers. If the securities were converted, their sole remedy was to follow the

proceeds. In re A. O. Brown, Ex parte First National Bank of Princeton, 175 Fed. 769, 99 C. C. A. 345 (C. C. A. 2). In that case I had decided that the customer might rescind for nonperformance and follow the consideration, but that was reversed. The case is different from In re A. O. Brown & Co., Ex parte Horrocks, 185 Fed. 766, 107 C. C. A. 656; In re A. O. Brown & Co., Ex parte Smart (D. C.) 185 Fed. 972; s. c. (D. C.) 189 Fed. 432, where the question was whether the broker, having executed the order, had ever received the securities.

In re Bolognesi & Co., 254 Fed. 770, 166 C. C. A. 216, and People v. Meadows, 199 N. Y. 1, 92 N. E. 128, are in this class. Why the customer should not have an equal right to rescind, whether the broker had received the stocks or not, was not and is not apparent to me, since delivery is as much a part of his obligation as receiving. However, A. O. Brown & Co., Ex parte First National Bank, supra, is a ruling on that point which I must accept. Under it Cole and Bonynge are confined to the proceeds of the securities.

I have not before me any report upon that subject, and therefore cannot pass upon their rights. The learned master has dealt only with the bank deposit. Hence Schrader and Salmond et al. must divide that between them in accordance with the rule laid down at the outset, providing Salmond can make good his claim. Cole and Bonynge may prove against any sum into which they can trace their securities.

### Feuerbach's Claim.

[3] Feuerbach was a customer trading on margin, and gave the brokers a written consent to pledge his securities unconditionally on their own loans, at the foot of which were written the words, "You to notify me of such intention." The purpose of this could only have been to enable him to redeem the securities before pledge. The brokers disregarded the condition and pledged the shares with many others to their bank, as they would have had unquestioned right to do, except for the condition. Feuerbach contends that the pledge was wrongful on this account, and that he should be allowed to reclaim his shares without contribution to others, whose shares were sold by the bank when the loan was closed out. This under In re McIntyre, Ex parte Pippey, 181 Fed. 955, 104 C. C. A. 419, In re Ennis, Ex parte Bamford, 187 Fed. 720, 109 C. C. A. 468, In re Toole (C. C. A.) 274 Fed. 337, 24 A. L. R. 470, and In re Wilson (D. C.) 252 Fed. 631.

This doctrine of priority between claimants takes its rise, so far as I know, in Tompkins v. Morton Trust Co., 91 App. Div. 274, 86 N. Y. Supp. 520. This was at a time before brokers adopted their present practice of requiring customers to give them express leave to pledge all securities, regardless of the extent of their lien, so long as the customer owes anything whatever. In re McIntyre, Ex parte Pippey, supra, and In re Ennis, Ex parte Bamford, supra, were also decided during that period. Now the law is that, without some such agreement, a broker may repledge only to the extent of his own lien, a restriction never in fact observed, and practically incapable of being observed. It was therefore an error when the courts made a distinction between customers whose securities were merely in safe-keeping and those whose

securities were held on margin, to put it on the ground that the pledge of one was wrongful and of the other was not. Each was wrongful, because the broker never regarded the limitation of his lien.

This was felt by Judge Noyes in his opinion in Re Ennis, Ex parte Bamford, supra, as well as the unreality of a distinction which threw a customer who had paid down 90 per cent. into the same class with one who had paid 10 per cent. or less, while it excluded him from the class who had paid the whole purchase price. And so the opinion in that case abandons any hard and fast rule by which the distinction turns upon the strict wrongfulness of the hypothecation, and Bamford got his priority though he owed something on his securities.

At present the question has generally speaking disappeared, because customers are ordinarily divided into two sharply cut groups by the agreements which brokers exact. As long as anything is due on their account, the broker may lawfully pledge all their securities for any amount; if nothing is due, he may not pledge them at all. Such an agreement puts what are known as class B customers in a very different position, at least formally. They have agreed to accept the risk of their broker's ability to redeem their property from larger liens than they themselves owe upon it. They cannot, therefore, expect to come forward in the guise of abused beneficiaries, but must contribute equally to a loss which all suffered because of a risk which all accepted. But a customer who gave no such consent and took no such risk may with justice insist that he should not so contribute.

In Feuerbach's case, had the question arisen before the modern practice, it would have been doubtful under In re Ennis, Ex parte Bamford, supra, whether he could have succeeded. A rule depending upon the degree of unlawfulness might have put him into class B as against customers whose securities were held merely for safe-keeping. Bamford got into class A because the sins against him were grievous, and Feuerbach cannot say so much. However that may be, we are dealing now with a class against whom no wrong at all has been practiced, and against whom I think Feuerbach has a priority. True, he might not have chosen to redeem his securities before they were repledged; but he reserved the right to do so, probably for a real purpose. Without the required notice and an opportunity to redeem, the pledge was certainly a conversion, and his stocks were exposed to a hazard which he had never accepted.

I therefore hold that he is entitled to a priority and need not contribute. I am assuming that all the other customers whose securities were in the loan had given unqualified consents.

### Hunsberger's Claim.

[4] Hunsberger claims part of the purchase price of 100 shares of General Motors stock; i. e., the last installment paid four days before bankruptcy, which he traces into one of the bank deposits of the bankrupt. He must show that the stock, though bought for him on January 3, was never received. In re A. O. Brown, Ex parte Horrocks, supra; In re A. O. Brown, Ex parte Smart, supra. On January 4, the brokers received 100 shares of General Motors stock, which they delivered out

on January 5. We do not, and I suppose cannot, know whether this was received upon a contract of purchase made in Hunsberger's behalf, but clearly that is possible, and under In re A. O. Brown, Ex parte Horrocks, supra, he must show that his shares were never received. As he fails to do so, he must fail to recover, since that may have been his stock and may have been converted.

The doctrine becomes, however, much complicated after Gorman v. Littlefield, 229 U. S. 19, 33 Sup. Ct. 690, 57 L. Ed. 1047, and Duel v. Hollins, 241 U. S. 523, 36 Sup. Ct. 615, 60 L. Ed. 1143. Those cases hold that all customers are co-owners in the shares actually on hand of the stock in question, and that no certificate retains any identity of ownership. Hence the brokers who received the requisite number of shares for a given customer do not hold those shares for him alone, unless they have on hand enough shares of that stock to answer the demands of all others. They have merely added to a bin which does not contain enough for all, and in which all share pro rata. If such be the notion, then the order of a customer has not been filled until the brokers have on hand in some given day enough shares to answer all claims. As soon as they once do that, any subsequent sale is then a conversion, which relegates the customer to following the proceeds under In re A. O. Brown, Ex parte First National Bank, supra.

In the case at bar the account in evidence does not disprove this fact, because the brokers received 1,352 shares after the receipt of 100 on January 4. On that day they had 151 shares besides that 100. When they failed, their account balanced only by crediting to it 1,048 shares of "short" customers, whose sales had almost certainly been "washed" with purchases. It is possible, however, that, of the 1,499 shares they owed to "long" customers, all but Hunsberger's are represented by the receipts since January 4. If so, then there were enough shares on hand on January 4 to answer all customers.

Now, nobody recognizes more acutely than I do the artificiality of all this reasoning. It is a practical certainty that this was not the case. However, if the doctrines of In re A. O. Brown, Ex parte First National Bank, supra, and of In re A. O. Brown, Ex parte Horrocks, supra, are both to be applied, it seems to me that one is necessarily compelled to proceed in this wise. I therefore conclude that, even after Gorman v. Littlefield, supra, and Duel v. Hollins, supra, Hunsberger has not shown the right to follow his money.

Of his claim for deceit, little need be said. He says that when he made his last payment the cashier said to him that the shares were in a box at the bank. There were 150 shares in the bank at the time, available to his purchase. The statement cannot be understood as meaning that there were any shares actually ticketed as his. Nor is there any evidence that these shares had been claimed by anyone else. I cannot find any actionable deceit in this. His claim is disallowed.

### Harriott's Claim.

[5] This claim is presented so irregularly that I cannot be sure that I understand it. So far as I do, it is this. Harriott had in the receiver's possession 1,500 shares of a stock which was selling at 5 cents a share. He requested the receiver to sell this stock, which he failed to do.

The stock went down in price, and Harriott has lost $60 by the delay, with which he seeks to charge the receiver. The receiver's attorney had told him that it would be safe to sell the stock, and the receiver had given orders to have it sold, but these were not carried out.

The receiver's possession of the shares was lawful, and he had no duty to sell when the claimant asked him to. While he was negligent in performing a duty which he voluntarily assumed, it was not a legal duty at all. Whether on demand and refusal the receiver would have been liable for conversion is another matter. The claim is denied.

### Expenses of the Reference.

[6] Wherever the expenses have arisen through a wrong of the bankrupt, the general estate should bear it, because the creditors must stand in the bankrupt's shoes. In re Pierson (D. C.) 225 Fed. 889; In re Wilson (D. C.) 252 Fed. 631, 668. That covers all the cases of those petitioners who have succeeded here. Those who have failed should bear the loss occasioned by their contest. However, it is impracticable to allocate anything but the stenographer's charges as to these, and they are ordinarily small. I will not award anything against those who failed. It follows that the estate must bear the expenses.

There will be no costs in this case.

### Supplemental Opinion.

Since filing my opinion of November 12, 1923, counsel have called to my attention the case of In re Bolognesi & Co., 254 Fed. 770, 166 C. C. A. 216, to which I referred. The end of that case, which I regret to say I did not observe at the time, distributed the funds in accordance with the rule of Knatchbull v. Hallett, L. R. 13 Ch. Div. 696, and Empire, etc., Co. v. Carroll County, 194 Fed. 593, 114 C. C. A. 435. Of course, it constitutes authority absolutely binding upon me and I must therefore modify my directions to the referee so as to accord with the law which controls in this circuit, regardless of my own opinion on the question. The referee will therefore in dividing the trust fund follow the principle that the last depositor shall be paid in full and so on until the fund is exhausted. This is the only modification necessary.