**FIRST NAT. BANK OF COLONY, KAN., et al. v. BEARD et al.**

**SAME v. HESTER et ux.**

**SAME v. STRICKLER et ux.**

**Nos. 1086–1088.**

Circuit Court of Appeals, Tenth Circuit.

Feb. 12, 1935.

Rehearing Denied March 27, 1935.

L. H. Hannen, of Burlington, Kan. (Otis S. Allen, of Topeka, Kan., on the briefs), for appellants.

Stanley E. Toland, of Iola, Kan. (G. R. Gard, of Iola, Kan., on the briefs), for appellees.

Before LEWIS and PHILLIPS, Circuit Judges, and JOHNSON, District Judge.

JOHNSON, District Judge.

The above entitled causes were tried together in the court below, argued together in this court, and since the facts are similar and the applicable principles of law the same in each of the causes, it is appropriate to dispose of them in one opinion.

The trial court made special findings in each case and as no statement of the evidence was settled, the sole question for review in each case is whether the findings support the decree. The contention is made by appellees that the assignments of error under the rules of this court and of the Supreme Court are insufficient to raise that question. This contention is not without some merit, but since the decree must be reversed in any event for plain error, the defects in the assignments will be disregarded and the question as to whether the findings support the decree considered and determined upon the merits. The parties will be referred to as they were designated in the court below.

The findings common to the three cases in substance are the following: The defendant, the First National Bank of Colony, Kan., was organized as a national bank in 1920. It carried on business as a national bank from the date of its organization un-

til the 13th day of August, 1931. On that day it was closed by resolution of the board of directors and placed in the hands of the comptroller of the currency. Samuel D. Weaver, sued as receiver in each case, was appointed receiver of said bank by the comptroller and continued to act as such receiver until his resignation in December, 1933. In January, 1934, W. L. Webber, his successor as receiver, was substituted as defendant in each of the cases.

The defendant J. V. Lintner, from the organization of the bank until its close, was a director and the cashier and in charge of the active and general management of the business of the bank. Prior to any of the transactions hereafter referred to, the defendant General Securities Company was organized as a corporation under the laws of Kansas. It was organized, among other things, to purchase and remove from the bank such of its assets as were criticized and ordered removed by national bank examiners. The defendant J. V. Lintner was president and general manager of this company. Until removed therefrom in May, 1931, by order of the comptroller of the currency, its office and place of business was in the banking rooms of the bank. The male plaintiff in each of the cases at the time of the solicitation by the defendant Lintner as hereinafter stated was indebted to the bank in a considerable amount for money theretofore borrowed from the bank through him, for which each had given his note or notes. Lintner under these conditions approached the respective borrowers and stated that the bank wanted to increase its cash reserves and to be able to take care of other borrowing customers; he suggested that he could secure the cash upon real estate mortgages upon their farms and apply the money so borrowed to paying off the loan of the respective borrower with the bank. The borrowers, having confidence in Lintner, agreed to this arrangement and authorized him to carry out his suggestion. Each of them thereupon executed a note and mortgage upon real estate owned by him to the General Securities Company. Lintner then proceeded to negotiate said notes and mortgages to the Guaranteed Securities Life Insurance Company, a corporation. These notes and mortgages in the hands of the Guaranteed Life Insurance Company were adjudged by the trial court to be valid and binding upon the makers.

The General Securities Company was by Lintner given credit in the defendant bank

for the amount of the several drafts received by him for the notes and mortgages sold by him to the Guaranteed Life Insurance Company. These credits were used by him to transfer from the defendant bank to the General Securities Company certain worthless and criticized securities of the bank. The drafts thus fraudulently acquired by the bank were later transmitted by it to its correspondents and credit taken.

In each transaction the principal of the respective notes was for more than was required to pay off the indebtedness owing the defendant bank. Each of the borrowers increased the amount of his mortgage loan above the amount required to pay off the bank so as to have money available for other necessary uses. After the negotiations of the several notes and mortgages and the receipt of the proceeds of their sale hereinafter specifically mentioned, and their fraudulent conversion in the manner stated, Lintner upon being asked advised each of the respective borrowers that the sale of his note and mortgage had not been completed. He offered to have the defendant bank loan to the borrower such small sums as he might require for his present needs to be repaid when the sale of his note and mortgage had been consummated—and such loans were made. No one of the plaintiffs was aware of the fraud practiced by the defendant Lintner until about the time of the failure of the bank in August, 1931.

The trial court also made the following findings:

"The general assets of the defendant bank when it passed into the hands of the receiver on August 14, 1931, exceeded $150,-000.00, and the total amount of cash on hand was six or seven thousand dollars. * * *

"The defendant bank at said time had a balance on hand to its credit in the Topeka bank of $76.15."

## Case No. 1086.

The findings of the trial court peculiar to this case are in substance as follows:

On or about the 20th day of December, 1930, the plaintiff Cyrus C. Beard was indebted to the bank on his individual, unsecured notes in the total sum of $1,800.

On or about this date Lintner, acting as cashier and general manager of the bank, solicited Beard to mortgage his farm and pay off his indebtedness to the bank with the proceeds of such mortgage loan, saying that because times were pretty hard the bank wanted to increase its cash reserves and to

be able to take care of other borrowing customers. Beard consented.

He had other debts which he wished to pay, and it was agreed between him and Lintner that such mortgage loan should be for the sum of $2,500, and that after the indebtedness to the bank had been paid, the balance of the proceeds of the loan was to be paid to Beard. Thereupon Beard and his wife executed a promissory note for $2,-500 and a mortgage upon their farm securing the same in favor of the General Securities Company and delivered them to Lintner.

On December 31, 1930, Lintner negotiated the note and mortgage to the Guaranteed Securities Life Insurance Company of Topeka, Kan., receiving in payment a draft upon the Fidelity Savings State Bank of Topeka, Kan. The draft was for $3,300 and represented the proceeds of the Beard note and mortgage of $2,500 and the proceeds of the Hester note and mortgage of $800 involved in case No. 1087. This draft was made payable to the order of the General Securities Company, the mortgagee. It was indorsed by Lintner and deposited in the defendant bank to the credit of the General Securities Company. The draft was returned to the Fidelity Savings State Bank for credit to the account of the defendant bank. The credit thus given the General Securities Company in the defendant bank was used by Lintner as cashier of said bank to remove from said bank criticized notes held by said bank, and which had been ordered removed from the assets of the bank by national bank examiners. The notes so removed had little if any value. After the delivery of said note and mortgage for $2,-500 and before the failure of the bank, on the representation by Lintner that the sale of his note and mortgage had not been consummated, Beard obtained from the bank on April 4, 1931, $275 for which he gave his note payable three months after date. On June 17, 1931, he obtained $200 from the bank for which he gave his note payable ninety days after date. On August 10, 1931, he obtained $100 for which he gave his note payable ninety days after date.

The bank at some time prior to its close acquired a note of Beard for the sum of $175 dated February 24, 1931, payable to the order of R. M. McCaughey.

On June 1, 1931, Beard gave the bank a renewal note for $1,800 for his indebtedness owing the bank on December 20, 1930. This renewal note for $1,800 of June 1, 1931,

and the note for $175 above mentioned were before August 13, 1930, by the defendant bank sold and delivered to the Federal Reserve Bank of Kansas City, Mo.

## Case No. 1087.

The findings of the trial court peculiar to this case are in substance as follows:

Edgar H. Hester had been a customer of the defendant bank since its organization. Lintner, the cashier, had represented the bank in Hester's dealings with it. These dealings had been satisfactory and Hester had confidence in Lintner, believing him to be an honest man.

On December 20, 1930, Hester was indebted to the bank in the sum of $700. On June 19, 1931, Hester executed a renewal note for this indebtedness.

Prior to the failure of the bank on August 13, 1931, it had sold and assigned this note to the Federal Reserve Bank of Kansas City, Mo.

On or about December 20, 1930, Lintner solicited Hester to mortgage his farm and pay off his indebtedness to the bank, and made the same representations to him that were made to Beard. Hester had other debts which he wished to pay, and it was agreed that the mortgage should be for the sum of $800. A note for $800, secured by a mortgage on his farm, was thereupon executed by Hester and his wife in favor of the General Securities Company. Lintner immediately negotiated the note and mortgage to the Guaranteed Securities Life Insurance Company and received and disposed of the proceeds in the manner already indicated. Representations similar to those made to Beard were made to Hester respecting delay in cashing his paper. Three so-called loans were made to Hester by the bank, namely: On April 27, 1931, $40; on June 19, 1931, $60; on July 15, 1931, $32. In each instance Hester gave the bank his note for the money received.

## Case No. 1088.

The findings of the trial court peculiar to this case are as follows:

On November 1, 1930, N. T. Strickler owed the bank $2,725. This indebtedness on August 13, 1931, the date of the failure of the bank, was evidenced by a renewal note dated June 1, 1931. Prior to the failure of the bank, this note was sold and assigned by the defendant bank to the Federal Reserve Bank of Kansas City, Mo.

On or about November 1, 1930, Lintner solicited Strickler to mortgage his farm and pay off his indebtedness to the bank, and made the same representations to him that were made to Beard and Hester.

Strickler had other debts which he wished to pay and his loan was made for $3,500. He executed a note for this amount and gave a mortgage on his farm signed by himself and wife to the General Securities Company securing the same. Lintner immediately sold the Strickler note and mortgage to the Guaranteed Securities Life Insurance Company and received and disposed of the proceeds in the manner already indicated. The Strickler draft was sent to the First National Bank of Kansas City, Mo., and credited to the account of the defendant bank. This account was overdrawn when the defendant bank was closed.

Under similar representations by Lintner in respect to delay in obtaining cash for his note and mortgage, Strickler received from the bank five purported loans for which in each instance he gave the bank his note, namely: On March 30, 1931, $150; on April 27, 1931, $75; on May 21, 1931, $60; on June 1, 1931, $185; on June 13, 1931, $550; on June 27, 1931, $125.

The prayers of the several amended complaints are the same in respect to the relief prayed for. As illustrative of their purport, the prayer of the complaint in case No. 1086 is quoted, as follows:

"Plaintiffs pray that said note and mortgage aforesaid be cancelled and held for nought, and that in case this is not done, that then the said indebtedness to the First National Bank of Colony, Kansas, evidenced by said promissory notes as aforesaid be ordered cancelled, held for nought and returned to these plaintiffs and that if the said First National Bank of Colony is now not the owner or holder of said notes or if they have passed into the hands of an innocent purchaser, that then plaintiffs have judgment against said Samuel D. Weaver, as Receiver of said bank, for the full amount of the money received by said bank through its manager and cashier J. V. Lintner, and that said judgment be made a preferred claim against any and all the assets of the said First National Bank for the payment of said judgment and that the defendant the Guaranteed Securities Life Insurance Company be enjoined and restrained from selling, assigning or disposing of said note and mortgage, and that plaintiffs have all other, further, legal and equitable relief as they

may be entitled to under all the facts and circumstances in the case, and that they have a further judgment for costs."

In the decree in each case the trial court decreed that the notes in the hands of the receiver for the small loans made to the borrowers during the summer of 1931 on the representation of Lintner that the borrowers' notes and mortgages had not been negotiated, should be canceled and surrendered to the respective plaintiffs by the receiver. A like order was made also in respect to the several notes of the respective borrowers sold to the Federal Reserve Bank of Kansas City prior to the failure of the bank, with the proviso, however, in each case that in the event the defendant bank and the receiver within ninety days from the date of the decree could not repurchase from the Federal Reserve Bank the respective promissory notes, and in case No. 1086 also the $175 note of Beard payable to the order of R. M. McCaughey, then the respective plaintiffs were awarded judgment against the bank and the receiver for the full amount of the respective notes with interest thereon from the 31st of December, 1930. And it was further decreed that "said judgment be paid out of the assets of the First National Bank of Colony, Kansas, by its receiver Samuel D. Weaver, as a preferred claim." As already stated, it was adjudged in each of the decrees that the respective notes and mortgages in the hands of the Guaranteed Securities Life Insurance Company were valid and binding upon the respective makers. This portion of the decree has not been appealed from.

■ We are of opinion the trial court committed no error in the cancellation of the small notes for purported loans held by the defendant bank when it closed. These purported loans were in equity no other than advances from the funds of the respective parties which the bank had in its hands from the proceeds of the sale of their respective notes and mortgages and which it, the bank, had fraudulently converted to its own use. The amount of these several advances should, of course, be deducted in each case from the proceeds realized from the sale of the respective notes and mortgages.

■ The proceeds from the sale of the several notes and mortgages involved, and misappropriated by Lintner and the bank, unquestionably constituted trust funds when received and as long as they remained in their hands. But as against other creditors of the insolvent bank to entitle plaintiffs to a preference in payment on account of the fraudulent conversion of the balance unaccounted for of these funds, it must appear that the proceeds arising from the sale of the several notes and mortgages in question not only increased the assets of the bank but that they, such proceeds, respectively may be traced and identified in whole or in part in the assets of the bank at the time such assets were taken over by the receiver. To the extent that the balance of such proceeds may be traced and identified, the several plaintiffs are entitled to a preference in payment from such traced and identified fund or property. The lien of trust funds and the preference given them is limited to the specific property in which they may be found or with which they may have been fraudulently commingled.

In these cases the several drafts representing the proceeds of the respective loans and which in the hands of Lintner and the bank were trust funds were first used as credits to the General Securities Company. These credits were absorbed by the bank by charging the securities company with the face value of criticized valueless notes. The bank by this sort of transactions fraudulently acquired the apparent ownership of the drafts. It later was given credits in the Topeka and Kansas City banks for the amount of the several drafts as above stated.

If these credits represented the proceeds of the drafts, then it becomes necessary to trace the use made of them. If the trust funds represented by these credits were lodged in any property of any kind whatsoever coming into the hands of the receiver, such property would be subject to a preferred lien in favor of the trust fund or funds traced into such property.

If these credits be treated as the equivalent of cash on hand the same as if they had been transferred in specie to the vaults of the bank, then these trust funds would be in the total cash and current credits of the bank at the date the several drafts were acquired by the bank and converted to its own use. It is highly improbable, although possible, that these trust funds can be traced into property of the bank other than its cash on hand and credits with other banks.

The trial court found that the bank at the time of its failure had six or seven thousand dollars in cash on hand and a credit of $76.15 in the Topeka bank. It may have had credits in other correspondent banks which would swell the total of defendant's cash and credits at the time of the failure.

Or it may at some time during the interim intervening between the conversion of the several drafts and the failure of the bank had on hand in cash and credits a total less than the total on hand at the date of the failure of the bank. In such event the preferred lien of plaintiffs would attach to such smaller total only. It is possible that the cash and credits on hand may be insufficient to pay off the full amount of preferred claims of the plaintiffs and other claimants similarly situated. In such event, the claimants holding preferred liens would be entitled to payment pro rata from the cash and credit fund of the bank, and, after such payment, would be entitled to the allowance of their claims for any balance as common claims against the bank.

From the foregoing discussion, it is apparent that one of the two possible alternatives must be adopted for tracing these trust funds—the strict rule limited to following the disposition of the credits in the Topeka bank and in the Kansas City bank—the other and more liberal rule in which both the cash and credits of the defendant bank would be included.

We are inclined to follow the more liberal and, as we think, the more equitable rule. This rule was approved and applied by the Fourth Circuit in the case of Schumacher v. Harriett (C. C. A.) 52 F.(2d) 817, 818, 82 A. L. R. 1. In that case the court said:

"On the other hand, it is equally well settled that, where a bank acting as trustee mingles a trust fund with its other funds, the common fund resulting is impressed with a trust to the amount of the trust fund which has been so commingled and lost its identity; and in such case the cestui que trust is entitled to have the trust declared and the trust fund separated from the other funds, even though the bank subsequently to the commingling may have added to and made payments from the common fund, as the presumption is that it respected the trust and did not make payment from the trust property. A limitation upon the rule is that the amount for which the trust is declared may not exceed the smallest amount which the common fund contained subsequent to the commingling of the trust funds. [Citing cases.] * * *

"As the fund upon which the trust is asserted in this case is the fund of cash and cash items which passed into the hands of the receiver, the question in the case is whether the $8,500 of plaintiff has been traced into that fund; for it is settled that it is not sufficient merely to prove that the trust property went into the general estate and increased the amount and value thereof which came into the hands of the receiver. Empire State Surety Co. v. Carroll County, supra (C. C. A.) 194 F. 593, at page 604, and cases there cited. We think that this question must be answered in the affirmative. The life insurance checks were received by the bank as cash and were treated by it as such. They increased the cash and cash items in the tills of the bank at the time. When it placed them to its credit in the Richmond and New York banks, it was dealing with them as its own; and the presumption is that cash which was left in its tills was intended to be subject to the trust. While it had, of course, the right to collect the checks, it had no right to place their proceeds to its credit in other banks without holding an equivalent amount in cash in its own vaults to satisfy the trust which it had assumed towards plaintiff; and we must assume that it respected the trust, as 'equity imputes an intention to fulfill an obligation.'

"The doctrine of tracing trust funds has been greatly liberalized in recent years. The old rule was that the right ceased when the property was turned into money and mixed and confounded in a general mass of property of the same description. The modern rule of equity, however, is that, 'where the fraudulent depositary so mingles goods which he has obtained by fraud with the mass of like goods of his own, the whole may be seized, or considered as held in trust, until equitable separation of the property of the defrauded party is made. So, advancing one step further, where money thus obtained has gone to swell the aggregate in the possession of the fraudulent party, it may, under proper proceedings, be segregated in amount from such aggregate sum, and made the subject of a trust, in order to accomplish the ends of justice.' [Citing cases.]

"Under modern banking conditions, the rule as stated should be held to apply to cash items received by a bank under a trust agreement as well as to cash so received. Such an item for all practical purposes differs not at all from currency. It increases the cash funds of the bank just as much as does a deposit of currency. If the bank cashes it and covers the proceeds into its vaults, the augmentation, of course, is apparent. If, however, the bank treats the

cash item as its own and uses it for other banking purposes, such as payment of debts or creating credits in other banks, the cash in the vaults of the bank is relieved to that extent; and, where a trust with respect to a cash item is involved, it must be presumed that the intention was that cash remaining in the vaults of the bank is to be substituted under the trust. There is no more reason, in such case, for refusing to declare a trust on the funds remaining than there would be to refuse to do so because the bank had paid out the identical currency which the cestui que trust had placed in its possession. In other words, we think that a cash item, which is accepted by a bank as cash and fulfills for it the functions of cash, must be treated as cash in determining whether the cash remaining in the bank is subject to a trust because of the commingling of trust funds."

The several decrees are vacated and set aside so far as in conflict with the views herein expressed, and the cases remanded to the court below with directions to set said causes down for further hearing and determination in accordance with the views herein expressed.